[No. A068633. First Dist., Div. Three. July 16, 1996.]

GEORGE BORG, Plaintiff and Appellant, v.
TRANSAMERICA INSURANCE COMPANY, Defendant and
Respondent.

COUNSEL

Ron Leaf for Plaintiff and Appellant.

Sarrail, Lynch & Hall, James A. Sarrail and Jonathan S. Larsen for Defendant and Respondent.

## OPINION

**McGUINESS, J.***—George Borg appeals from an adverse judgment in his action against respondent Transamerica Insurance Company for breach of a duty to defend under the terms of a comprehensive general liability policy. The action arises out of Transamerica's denial of Borg's tender of the defense of a third party lawsuit, alleging damages on account of a structural encroachment from real property belonging to Borg over adjoining real property belonging to the third party. Borg contends the trial court erred in determining that Transamerica had no duty to defend the lawsuit because the encroachment was created prior to the effective date of Transamerica's insurance policy. We agree with Borg, and therefore reverse the judgment.

### FACTUAL AND PROCEDURAL BACKGROUND

Borg purchased residential real property in Redwood City in 1971. Included in the purchase were three structures that encroached from the property onto an adjoining vacant lot: a redwood deck extending six to eight feet out from the house, overhanging a hillside and resting on concrete piers; three wooden planter boxes terraced down the hillside; and a concrete pad for a garage. In 1986, Borg performed work on both the deck and the garage to strengthen those structures and to reinforce their foundations on the hillside.

At some point prior to April 1989, Jeffrey C. Brown purchased the vacant lot adjoining Borg's property. In October 1991, Brown filed a lawsuit against Borg for damages and a permanent injunction requiring Borg to remove structures allegedly encroaching and trespassing on Brown's property. Brown's complaint alleged two causes of action. The first, entitled "Willful Trespass," alleged that "[o]n or about April 4, 1989,"[1] Borg had built the deck over the property line, "willfully and intentionally" causing it to encroach and trespass on Brown's property "without any good faith belief that he had a right to do so." Brown alleged that the encroachment had rendered Brown's property "not saleable," resulting in financial loss to him. He asked for a permanent injunction requiring Borg to remove the encroachment and to restore the underlying property to its previous condition. The second cause of action, entitled "Negligent Trespass," separately alleged that

---

*Judge of the Alameda Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

[1]There is no dispute between the parties that the subject deck was actually built several years before this date. For purposes of Transamerica's duty to defend under its comprehensive general liability policy, however, it is the date alleged on the face of the underlying complaint which is important. Transamerica assumed that the deck was built on this date (Apr. 4, 1989) at the time it denied Borg's tender of defense.

"[a]s a proximate result" of Borg's negligence in encroaching and trespassing on Brown's property, "plaintiff [Brown] has suffered damages from the loss of use of the property encroached on in the sum of $36,000.00"

At the time Brown's lawsuit was filed, Borg had a homeowners insurance policy with Transamerica that included comprehensive general liability coverage. The policy was in effect from February 8, 1991, to February 8, 1992. It obligated Transamerica to "pay up to our limit of liability" for "property damage caused by an occurrence to which this coverage applies" and "for which the insured is legally liable"; and to "provide a defense at our expense by counsel of our choice" to "a claim . . . or . . . suit . . . brought against an insured" for such property damage, "even if the suit is groundless, false or fraudulent." The policy defined "occurrence," among other things, as "an accident, including exposure to conditions, which results, during the policy period, in . . . property damage." The term "property damage" was defined as "physical injury to, destruction of, or loss of use of tangible property."

On December 27, 1991, Borg tendered the defense of the Brown lawsuit to Transamerica. On January 6, 1992, a Transamerica claims adjuster wrote the following memorandum in the Transamerica claims file: "On 4/4/89 the [insured] built a deck on the west portion of his property. The plaintiff, who owns ajoining [sic] property, alleges that the deck encroaches on his property. The plaintiff has alleged damages totalling [sic] $36,000 giving rise to this lawsuit. The two causes of action are for willful and negligent trespass. In reviewing the policy I find that the policy is a new issue for the year 2/8/91 to 2/8/92 and we did not provide coverage on 4/4/89. We may have an occurrence as defined in the policy as the deck was accidently [sic] built on the plaintiff[']s property if in fact the property belongs to the plaintiff. We do have property damage in the loss of use of the plaintiff property and diminuation [sic] in value of plaintiff property without the encroached on parcel. All of this has to be proven by a property survey. The claim will be denied as we did not insure the property when the deck was built."

By letter dated January 7, 1992, Transamerica denied Borg's tender of defense on the grounds that "the loss occurred outside of our policy period." Transamerica's denial was based on the allegation in the Brown complaint that the encroaching deck was constructed on April 4, 1989, before the Transamerica insurance policy coverage period of February 8, 1991, to February 8, 1992. At the conclusion of trial on the Brown lawsuit, the court issued a decision finding in Borg's favor that the subject encroachments had existed substantially more than five years prior to the filing of the Brown lawsuit, and Borg had therefore acquired them as prescriptive easements by adverse possession. The total cost of defending the Brown lawsuit was

$13,255.15. On March 5, 1993, Borg renewed his demand on Transamerica for costs of defense. Transamerica again denied the demand on the grounds that its policy was not in effect at the time the encroachments were constructed.

On May 11, 1993, Borg sued Transamerica for breach of contract, breach of the implied covenant of good faith and fair dealing, and fraud. Transamerica moved for summary judgment on the grounds that there could be no coverage for claims based on property encroachments unless the liability insurance policy was in effect at the time the encroachments were constructed. On January 27, 1994, the trial court denied the motion for summary judgment, finding that there remained triable issues of material fact as to the nature of the property encroachments and whether there had been a covered "occurrence" within the policy period.

Borg then moved for summary judgment, arguing that the trial court's denial of Transamerica's motion for summary judgment established Transamerica's duty to defend as a matter of law. On April 28, 1994, the trial court denied Borg's motion on the grounds that the denial of Transamerica's earlier motion did not establish its duty to defend, and there remained triable issues of material fact.

Trial on Borg's lawsuit was trifurcated so that the issues of coverage and duty to defend were tried first. At the conclusion of court trial on the issue of Transamerica's duty to defend, the trial court found that the encroachment was permanent, and that Transamerica was not obligated to provide coverage and had no duty to defend because the encroachment was created before the effective date of Transamerica's policy. This appeal followed.

## Duty to Defend

At issue in this case is Transamerica's duty to defend Borg under the terms of its comprehensive general liability insurance policy. ■ It is well settled that the duty to defend is broader than the obligation to indemnify, from which it must be distinguished. The courts have imposed a duty to defend whenever an insurer ascertains facts which give rise to the possibility or the *potential* of liability to indemnify. Unlike the obligation to indemnify, which is only determined when the insured's underlying liability is established, the duty to defend must be assessed at the very outset of a case. An insurer may have a duty to defend even when it ultimately has no obligation to indemnify, either because no damages are awarded in the underlying action against the insured or because the actual judgment is for damages not covered under the policy. (*Montrose Chemical Corp.* v. *Admiral Ins. Co.*

(1995) 10 Cal.4th 645, 659, fn. 9 [42 Cal.Rptr.2d 324, 897 P.2d 1] (*Montrose II*); *Montrose Chemical Corp.* v. *Superior Court* (1993) 6 Cal.4th 287, 299-300, 303-304 [24 Cal.Rptr.2d 467, 861 P.2d 1153] (*Montrose I*); *Horace Mann Ins. Co.* v. *Barbara B.* (1993) 4 Cal.4th 1076, 1081, 1084 [17 Cal.Rptr.2d 210, 846 P.2d 792]; *Gray* v. *Zurich Insurance Co.* (1966) 65 Cal.2d 263, 276 [54 Cal.Rptr. 104, 419 P.2d 168]; *City of Laguna Beach* v. *Mead Reinsurance Corp.* (1990) 226 Cal.App.3d 822, 830 [276 Cal.Rptr. 438]; *Saylin* v. *California Ins. Guarantee Assn.* (1986) 179 Cal.App.3d 256, 263 [224 Cal.Rptr. 493]; *CNA Casualty of California* v. *Seaboard Surety Co.* (1986) 176 Cal.App.3d 598, 605-606 [222 Cal.Rptr. 276].)

■ The Supreme Court has repeatedly held that when a suit against an insured alleges a claim that potentially or even possibly could subject the insured to liability for covered damages, an insurer must defend unless and until the insurer can demonstrate, by reference to undisputed facts, that the claim *cannot* be covered. "To prevail, the insured must prove the existence of a *potential for coverage*, while the insurer must establish *the absence of any such potential.* In other words, the insured need only show that the underlying claim *may* fall within policy coverage; the insurer must prove it *cannot.* Facts merely tending to show that the claim is not covered, or may not be covered, but [which] are insufficient to eliminate the possibility that resultant damages (or the nature of the action) will fall within the scope of coverage, therefore add no weight to the scales. Any seeming disparity in the respective burdens merely reflects the substantive law." (*Montrose I, supra,* 6 Cal.4th at p. 300.) A duty to defend does not exist only when the underlying complaint " '. . . *can by no conceivable theory raise a single issue which could bring it within the policy coverage.*' " (*Ibid.*, quoting *Gray* v. *Zurich Insurance Co., supra,* 65 Cal.2d at p. 276, fn. 15, italics added by court in *Montrose I.*) For this reason, where there is any doubt as to whether the duty to defend exists, the doubt must be resolved in favor of the insured and against the insurer. (*Vann* v. *Travelers Companies* (1995) 39 Cal.App.4th 1610, 1614-1615 [46 Cal.Rptr.2d 617]; *CNA Casualty of California* v. *Seaboard Surety Co., supra,* 176 Cal.App.3d at p. 605; *Eichler Homes, Inc.* v. *Underwriters at Lloyd's, London* (1965) 238 Cal.App.2d 532, 538 [47 Cal.Rptr. 843].)

■ In this case, Transamerica's insurance policy obligated it to defend Borg in any suit alleging an injury covered under the policy, "even if the suit is groundless, false or fraudulent." "Under such a clause it is the duty of the insurer to defend the insured when sued in any action where the facts alleged in the complaint support a recovery for an 'occurrence' covered by the policy, regardless of the fact that the insurer has knowledge that the injury is not in fact covered. [Citations.]" (*Remmer* v. *Glens Falls Indem. Co.* (1956) 140 Cal.App.2d 84, 90 [295 P.2d 19, 57 A.L.R.2d 1379] (*Remmer*).)

## TERMS OF TRANSAMERICA'S POLICY

■ Insurance policies are contracts. As such, they are interpreted in the first instance by the rules of construction applicable to contracts. Under standard rules of contract interpretation, the mutual intent of the parties at the time the contract was formed governs its construction. (Civ. Code, § 1636.) So far as possible, we must infer that intent solely from the written provisions of the contract. (*Id.*, § 1639.)

■ We are mindful of the fact that any ambiguity in the language of an insurance policy must be interpreted broadly in order to protect the objectively reasonable expectations of the insured. Because it is generally the insurer who drafts the policy, ambiguous language is construed against the insurer and in favor of coverage. (*Montrose II, supra*, 10 Cal.4th at p. 667.) On the other hand, where the express provisions of an insurance contract are unambiguous, the "clear and explicit" meaning of those provisions, interpreted in their "ordinary and popular sense," controls judicial interpretation, unless "used by the parties in a technical sense, or unless a special meaning is given to them by usage . . . ." (Civ. Code, §§ 1638, 1644.) Thus, we are not free to restrict or limit insurance coverage by disregarding the unambiguous language of an insurance policy in favor of a technical interpretation that contradicts the plain meaning of that language. "If the meaning a layperson would ascribe to the language of a contract of insurance is clear and unambiguous, a court will apply that meaning." (*Montrose II, supra*, 10 Cal.4th at pp. 666-667; see *AIU Ins. Co.* v. *Superior Court* (1990) 51 Cal.3d 807, 822 [274 Cal.Rptr. 820, 799 P.2d 1253].)

■ Under Transamerica's policy, an "occurrence" that triggers coverage is defined as "an accident, including exposure to conditions, which results, during the policy period, in . . . property damage," defined as "physical injury to, destruction of, or loss of use of tangible property." This policy language does not require that the occurrence itself must take place during the policy period. Instead, what must take place "during the policy period" is the "property damage" *resulting from* the occurrence. In other words, only the property damage itself must take place during the policy period; the "occurrence" that was the ultimate cause of this damage need not have taken place during the term of the policy. Moreover, there is nothing in the policy requiring that the damage first appear during the policy term in order for it to be covered.

■ The definition of property damage broadly includes "loss of use." This phrase is not limited or modified by the preceding language including within the definition of property damage "physical injury to" or "destruction

of" tangible property. Grammatically, the three concepts of physical injury, destruction, and loss of use are joined *disjunctively* by use of the word "or." The clear separation between the three definitional concepts indicates that the phrase "loss of use" must be interpreted as distinct from physical damage or destruction. It is not logical to interpret this definition of property damage as limiting coverage for "loss of use of tangible property" to losses caused by or relating to some physical injury or destruction of the property in question.[2]

Finally, the policy definition of property damage limits "loss of use" to "tangible property." This term is meant to exclude intangible economic interests and property rights. It has been defined in its plain and ordinary sense as limited to property having physical substance apparent to the senses, including real estate. (*Warner* v. *Fire Ins. Exchange* (1991) 230 Cal.App.3d 1029, 1034 [281 Cal.Rptr. 635]; *Giddings* v. *Industrial Indemnity Co.* (1980) 112 Cal.App.3d 213, 219 [169 Cal.Rptr. 278].)

The second cause of action in the underlying Brown lawsuit alleged that as a proximate result of Borg's "causing" physical structures to encroach on the adjoining property, Brown "has suffered damages from the loss of use of the property encroached on in the sum of $36,000.00." The "property encroached on," of which Brown alleged this "loss of use," was expressly "real property." Although the complaint did not specifically state the period of this "loss of use," it alleged that the encroachment was constructed "[o]n or about April 4, 1989," and clearly implied that the loss of use began at that point and continued up to the filing of the lawsuit in October 1991. As such, we conclude that the allegation in the complaint for damages arising from "loss of use" of tangible real property created a *potential* obligation on Transamerica's part to indemnify Borg for a claim for continuing "property

---

[2]The Transamerica policy language is thus distinguishable from that at issue in *Gunderson* v. *Fire Ins. Exchange* (1995) 37 Cal.App.4th 1106, 1117-1119 [44 Cal.Rptr.2d 272]. In that case, this court examined policy language defining "property damage" as "physical injury to or destruction of tangible property, *including* loss of its use." (Italics added.) This court held that the concluding phrase "including loss of its use" referred to and was modified by the rest of the definition, which required some kind of physical damage to tangible property. (*Ibid.*) In contrast, the language in the Transamerica policy clearly separates "loss of use of tangible property" from the distinct concepts of physical injury and destruction with the use of the word "or," instead of "including" loss of use within a requirement of some kind of physical damage.

*Gunderson* is additionally distinguishable from this case because the underlying lawsuit in that case alleged only equitable causes of action for declaratory and injunctive relief and to quiet title, without any claim for damages on the basis of damage to tangible property. (37 Cal.App.4th at pp. 1115, 1119.) In this case, the Brown lawsuit specifically alleged damages for loss of use of tangible property (real estate).

damage" occurring during the policy period in effect from February 8, 1991, to February 8, 1992.[3]

## DETERMINATIVE DATE OF POLICY COVERAGE

■ Transamerica contends, and the trial court agreed, that it had no duty to defend or indemnify Borg because the loss occurred when the encroachment was created in or before April 1989, prior to the effective date of the policy. Transamerica bases this contention entirely on two cases holding that where claims of property damage flow from the construction of an encroaching structure in the nature of a permanent trespass, the determinative date for coverage is the date the encroachment was created, not the date it was discovered. (*American Empire Surplus Lines Ins. Co.* v. *G. E. Leach Construction* (1990) 223 Cal.App.3d 226, 229 [272 Cal.Rptr. 704] (*American Empire*); *Tijsseling* v. *General Acc. etc. Assur. Corp.* (1976) 55 Cal.App.3d 623, 626-628 [127 Cal.Rptr. 681] (*Tijsseling*).) We disagree with this argument.

In the first place, both *American Empire* and *Tijsseling* are distinguishable from this case with respect to both their factual circumstances and their legal contexts. *American Empire* was a declaratory relief action by an insurance company to determine whether liability arising from a contractor's accidental construction of an encroachment was covered by the insurance policy in effect at the time the encroachment was constructed, or by a different insurance policy in effect when the encroachment was discovered. Significantly for our decision in this case, the issue was one of coverage and not of the duty to defend. Both insurance companies actually shared in the defense of the claims against the contractor, and the only remaining issue was the question of reimbursement between the carriers. (*American Empire, supra,* 223 Cal.App.3d at p. 228.)

The insurance policy in effect at the time the encroachment was discovered in *American Empire* defined "property damage" as " ' . . . (1) physical injury to or destruction of tangible property which *occurs during the policy period,* including the loss of use thereof at any time resulting therefrom, or (2) loss of use of tangible property which has not been physically injured or destroyed provided such loss of use is caused by an *occurrence during the policy period.*' " (223 Cal.App.3d at p. 229, italics added by court in *American Empire.*) Thus, the policy at issue in *American Empire* expressly specified that in order to be covered, "loss of use" had to result from injury to or

---

[3]We note that the internal memorandum prepared by the Transamerica claims adjuster acknowledged the existence of property damage and a potential "occurrence" under the policy language. The memorandum disputed coverage solely on the ground that the encroachment was allegedly constructed before the effective date of policy coverage.

destruction of property; any other "loss of use" of physically undamaged property had to be caused by an occurrence that took place *during the policy period.* This language with respect to "loss of use" is precisely the *opposite* of that in the Transamerica policy, which provides coverage for *any* loss of use of tangible property experienced during the period covered by the policy, whether or not the original "occurrence" or accident causing the loss also took place during that time. The holding in *American Empire* limiting the insurer's exposure to the policy period during which the encroachment was accidentally created is therefore compatible with the specific policy language at issue in that case with respect to coverage for loss of use of physically undamaged tangible property.

*American Empire* is further distinguishable from the instant case by differences between the allegations of the underlying lawsuits from which the claims for insurance coverage arise. In *American Empire*, the complainant property owners did not sue for removal of the encroachment, but only for damages for delays, additional construction costs, and lost income in connection with development of the affected property. The encroachment in that case was the foundation of a two-story office building. For this reason, the *American Empire* court treated the encroachment as a "permanent trespass." (*American Empire, supra*, 223 Cal.App.3d at pp. 228-229.) In this case, the only encroachment mentioned in the underlying Brown complaint was a deck extending out from a house. The Brown lawsuit specifically sought an injunction "compelling [Borg] to remove the encroachment . . . from plaintiff's property and to restore plaintiff's property to its condition immediately prior to such encroachment." Thus, unlike the underlying complainants in *American Empire*, the Brown lawsuit did not treat the encroachment as a permanent trespass.

In ruling that the determinative date for coverage was the date the encroachment was created and not the date it was discovered, the *American Empire* court relied on the decision in *Tijsseling.* (*American Empire, supra*, 223 Cal.App.3d at pp. 229-230.) Like *American Empire* and unlike this case, *Tijsseling* was an action for declaratory relief to determine which of several insurance carriers was obligated to indemnify the liability of the insured; the insurer's duty to defend was not in issue. The plaintiffs in the underlying suit in *Tijsseling* sued only for negligent misrepresentation arising from the insured's sale of two parcels of real estate including a house on one parcel that encroached on the other. Unlike the situation in this case, in *Tijsseling* there was no claim for damages from loss of use, or for an injunction to remove the encroachment. Like *American Empire*, the *Tijsseling* case is therefore distinguishable both factually and procedurally from the one before us.

Both *American Empire* and *Tijsseling* purported to rely on the well-established "general rule" stated in *Remmer, supra,* 140 Cal.App.2d 84, "that the time of the occurrence of an accident within the meaning of an indemnity policy is not the time the wrongful act was committed, but the time when the complaining party was actually damaged." (*Id.* at p. 88; see *Tijsseling, supra,* 55 Cal.App.3d at pp. 626-627; *American Empire, supra,* 223 Cal.App.3d at p. 229.) In our opinion, *Remmer* actually supports the position advanced by appellant Borg in this case that the "loss of use" alleged in the underlying Brown complaint constituted property damage within the Transamerica policy period, and therefore triggered potential coverage under the terms of that policy and the consequent duty to defend.

Like the instant case, and unlike either *American Empire* or *Tijsseling,* *Remmer* was a dispute between an insured and an insurer, rather than an action for a declaratory judgment allocating a loss among several insurance carriers. At issue in *Remmer* was whether the insured's act of defectively grading and filling his property constituted a triggering "occurrence" under the terms of a comprehensive general liability policy providing that the policy " '. . . applies only to occurrences during the policy period,' " and defining an "occurrence" as " 'an accident, or a continuous or repeated exposure to conditions, which results in injury during the policy period . . . .' " (*Remmer, supra,* 140 Cal.App.2d at pp. 85-86.) The policy in *Remmer* was in effect when the defective work was done, but had been canceled before a landslide occurred which resulted in the insured's liability to an adjoining landowner on the ground of nuisance. The underlying lawsuit sued for damages and abatement of the nuisance as it currently existed at the time of the lawsuit. The court held that because the property damage for which the insured was sued occurred after the policy period, the resulting liability was not covered by the policy, even though the original wrongful act which actually caused the damage occurred during the policy period. As the *Remmer* court stated: "[I]t is not the happening of the wrongful act that is covered by the policy, but the damage flowing therefrom. To be covered by the policy the damage sued for must have occurred during the policy." (*Id.* at pp. 88-90.)

Thus, *Remmer* distinguishes between a wrongful act and the injurious result of that act, and holds that the triggering of liability under a comprehensive general liability policy is established at the time the complaining third party was actually damaged.[4] In *Remmer,* as in this case, the underlying lawsuit alleged a diminution in value to adjoining property caused by

---

[4]This rule has been adopted and followed in every jurisdiction of the United States that has considered the issue except Louisiana. (See cases and annotations cited in *Montrose II, supra,* 10 Cal.4th at p. 670.)

*continuing* property damage from an encroachment that was first created at some point in the past. Also as in this case, the underlying lawsuit in *Remmer* stated a cause of action for trespass and sought injunctive relief requiring the removal or abatement of the offending encroachment. (*Remmer, supra,* 140 Cal.App.2d at pp. 86-88.) The fact that the underlying complaint in *Remmer* sounded in nuisance rather than "loss of use" is not controlling. As the *Remmer* court pointed out, the nuisance in that case was continuing and dated from the original defective grading and filling. The Brown lawsuit, like the underlying lawsuit in *Remmer*, alleged continuous damage and injury from the date the original wrongful act occurred. A landslide such as that which occurred in *Remmer* would likely be no easier to remove or abate than the overhanging deck alleged in the Brown lawsuit. Thus, the "nuisance" label does not serve to distinguish the encroachment in *Remmer* from that in this case.

The one salient difference between *Remmer* and this case is simply that in *Remmer*, the subject insurance policy was in effect at the time of the original wrongful act, but was no longer in effect at the time of the damage alleged in the complaint. For that reason, the court found that there was no coverage. Here, the reverse is true. Transamerica's policy was not yet in effect at the time of the original wrongful act—the construction of the deck—but *was in effect* at the time of the damage alleged in the underlying third party lawsuit. Applying the holding in *Remmer* to the facts presented here, we conclude that the Brown lawsuit triggered potential coverage for property damage by alleging a continuing "loss of use" of tangible real property and consequent damage during the period of Transamerica's policy.

This conclusion is supported by the recent Supreme Court decision in *Montrose II, supra,* 10 Cal.4th 645, which also relies on *Remmer*. The relevant language of the comprehensive general liability policy at issue in *Montrose II* was fundamentally indistinguishable from that of the Transamerica policy in this case.[5] Reading the policy definitions of "occurrence" and "property damage" together, the Supreme Court found the language "unambiguously distinguishes" between the causative event—an accident or exposure to conditions—and the resulting injury or damage. As in the instant

[5]The insurance policy in *Montrose II* contained language identical to that of the policy addressed by the court in *American Empire.* (*Montrose II, supra,* 10 Cal.4th at pp. 668-669; *American Empire, supra,* 223 Cal.App.3d at p. 229.) As discussed above, under the *American Empire* policy "property damage" was defined as "loss of use of tangible property which has not been physically injured or destroyed provided such loss of use is caused by an *occurrence during the policy period.*" It was this language which distinguished *American Empire* from the policy at issue in the instant case, which provides coverage for *any* loss of use of tangible property during the policy period whether or not the original "occurrence" also took place at that time. However, the Supreme Court in *Montrose II* expressly did not address this specific policy language dealing with "loss of use." Unlike our case, the Supreme Court in *Montrose II* thus had "no occasion to decide whether coverage, under such a policy, for loss of use of tangible property which has not been physically injured or destroyed is dependent upon

case, it is the latter injury or damage that must occur during the policy period, and "which results" from the "accident" or "exposure to conditions." (*Montrose II, supra,* 10 Cal.4th at p. 669.) Citing *Remmer* and "settled case law" that policy coverage was "triggered by damage or injury occurring during the policy period," the court adopted the "continuous injury trigger of coverage," holding that "property damage that is continuous or progressively deteriorating throughout successive [comprehensive general liability] policy periods, is *potentially covered by all policies in effect during those periods.*" (*Montrose II, supra,* 10 Cal.4th at pp. 669-670, 673, 689, italics added.)[6]

At the very least, *Montrose II* obliges us to narrowly interpret the "rule" stated in *American Empire* and *Tijsseling* as strictly limited to their factual and procedural circumstances. As noted, in both *American Empire* and *Tijsseling* the underlying lawsuits did not seek removal or abatement of the structural encroachments at issue, which themselves were indisputably "permanent." Perhaps more importantly, both *American Empire* and *Tijsseling* were actions for declaratory relief seeking to allocate the obligation to indemnify among several successive insurance carriers. The Supreme Court has specifically questioned reported decisions that fail to distinguish such lawsuits involving multiple carriers from disputes such as the instant case between an insured and an insurer to determine coverage or the duty to defend. (*Montrose II, supra,* 10 Cal.4th at p. 665.)[7]

---

whether *the loss of use* of the property *occurs during the policy period,* or whether the *occurrence* which results in the loss of use *occurs during the policy period." (Montrose II, supra,* 10 Cal.4th at p. 668, fn. 12.) For our purposes, there is no material difference between the policy language actually discussed in *Montrose II* and that at issue in this case.

[6]As the Supreme Court explained, the term "trigger of coverage" is "a term of convenience used to describe that which, under the specific terms of an insurance policy, must happen in the policy period in order for the *potential* of coverage to arise. The issue is largely one of timing—what must take place *within the policy's effective dates* for the potential of coverage to be 'triggered'? Whether coverage is ultimately established in any given case may depend on the consideration of many additional factors, including the existence of express conditions or exclusions in the particular contract of insurance under scrutiny, the availability of certain defenses that might defeat coverage, and a determination of whether the facts of the case will support a finding of coverage." (*Montrose II, supra,* 10 Cal.4th at p. 655, fn. 2.)

[7]As the Supreme Court stated: "Unfortunately, some courts have failed to draw these critical distinctions when discussing coverage issues . . . . In the third party liability insurance context, some reported cases have muddied the waters by seemingly failing to distinguish between disputes arising between an insured and insurer, and actions among several [comprehensive general liability] carriers that seek a judicial declaration allocating a loss already paid out to the insured under one or more such policies. In suits between an insured and an insurer to determine coverage, interpretation of the policy language and, in the case of ambiguous policy language, the expectations of the parties, will typically take precedence. . . . [¶] In contrast, where two or more [comprehensive general liability] carriers turn to the courts to allocate the cost of indemnity for a paid loss, different contractual and policy considerations may come into play in the effort to apportion such costs among the

Transamerica attempts to distinguish *Montrose II* from this case by arguing that "the present case does not involve a continuous and progressive property damage." This argument is disingenuous. Contrary to Transamerica's assertion, the Supreme Court in *Montrose II* specifically and repeatedly referred to "continuous *or* progressively deteriorating" property damage. There is no suggestion in the opinion that both kinds of property damage must be present for the continuous injury trigger of coverage to be applicable. (*Montrose II, supra*, 10 Cal.4th at pp. 673, 689, italics added.) As shown by the Supreme Court's reliance on *Remmer* and other cases dealing with encroachments, the rule announced in *Montrose II* is not limited to hazardous waste cases or other factual scenarios involving progressively worsening exposure to toxics or other injury-causing substances.

We conclude that under the continuous injury trigger of coverage adopted by the Supreme Court in *Montrose II* and the unambiguous express language of Transamerica's policy, appellant Borg has established that, at the time he tendered defense of the underlying third party lawsuit to Transamerica, there was at least a potential for coverage under the policy. (*Montrose II, supra*, 10 Cal.4th at pp. 666-670, 673, 677, 685-689.) On the other hand, Transamerica has failed to prove that the claims made in the underlying third party lawsuit could not possibly have fallen within the coverage of its policy. Therefore, Transamerica had a duty to defend its insured in the underlying lawsuit. (*Vann* v. *Travelers Companies, supra*, 39 Cal.App.4th at pp. 1614-1615, 1619.)

## DISPOSITION

The judgment is reversed. Transamerica shall pay appellant's costs on appeal.

Corrigan, Acting P. J., and Parrilli, J., concurred.

---

insurers. The task may require allocation of contribution amongst all insurers on the risk in proportion to their respective policies' liability limits (such as deductibles and ceilings) or the time periods covered under each such policy. Reported cases whose analyses fail to take these distinctions into account, although purporting to clarify or settle an underlying 'trigger of coverage' issue, may shed more darkness than light on the matter." (*Montrose II, supra*, 10 Cal.4th at p. 665.)