[No. B108694. Second Dist., Div. Two. Dec. 22, 1998.]

WAUSAU UNDERWRITERS INSURANCE COMPANY et al., Plaintiffs and Appellants, v.
UNIGARD SECURITY INSURANCE COMPANY et al., Defendants and Respondents.

**[Opinion certified for partial publication.\*]**

---

\*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of part VI.

## COUNSEL

Zelle & Larson, Alex M. Duarte; Albert, Weiland & Golden and Marcus M. Kaufman for Plaintiffs and Appellants.

Haight, Brown, & Bonesteel, Gary A. Bague, Rita Gunasekaran, Richard E. Wirick, Christopher Kendrick for Defendent and Respondent Unigard Security Insurance Company.

Charlston, Revich & Williams, Kirk C. Chamberlin, K. Noelle Ponsetto, Stephen P. Soskin and Paul D. Albus for Defendants and Respondents Federal Insurance Company and Home Insurance Company.

Caron, McCormick, Constants & Goldberg and Patricia M. Wilson for Defendant and Respondent American Automobile Insurance Company.

## OPINION

**ZEBROWSKI, J.**—This is an allocation or apportionment case among insurers. Several insurers issued policies allegedly covering pollution-related damages sought in an underlying case, but only one defended. The defending insurer now seeks equitable contribution to defense costs from the nondefending insurers. The issue presented, however, is not what amounts the nondefending insurers should contribute, but instead whether they should contribute at all. The nondefending insurers contend that they have no duty to contribute to defense costs on the theory that they had no duty to defend the insured in the underlying case. The nondefending insurers contend that they were in possession of evidence extrinsic to the complaint in the underlying case, and that this extrinsic evidence established that the damages sought in the underlying case were all excluded from coverage. Thus although this is an allocation or apportionment case among insurers, the issue on appeal is the preliminary issue of duty to defend. The trial court found that the nondefending insurers had no duty to defend, and granted judgment in their favor. The defending insurer now appeals.

Each insurer's duty to defend must be assessed independently, since the duty of each is independent of whatever duty another might have.[1] Comparing the allegations of the underlying complaint with the extrinsic evidence

---

[1] At least insofar as this record reflects. In the absence of specific policy clauses conditioning one insurer's duty to defend upon the duties assumed in another policy by another insurer, each insurer's duty to defend is independent. No such clauses are involved in this case.

relied upon by the nondefending insurers clearly shows that the extrinsic evidence did not eliminate the possibility of coverage. Hence, at least insofar as the extrinsic evidence is concerned, each insurer had a duty to defend.[2] In the published portion of this opinion, we therefore reverse and remand for determination of issues either reserved or not reached by the trial court. In the unpublished portion of this opinion, we reverse and remand, on procedural grounds, the trial court's additional determination that defendant Unigard was additionally entitled to judgment because it did not insure any of the defendants in the underlying action.

## I. FACTUAL BACKGROUND.

Appellants are Employers Insurance of Wausau and Wausau Underwriters Insurance Company (collectively the defending insurer). Respondents are Unigard Security Insurance Company (Unigard), American Automobile Insurance Company (referred to by the parties and by this court as Fireman's Fund), Home Insurance Company (Home), and Federal Insurance Company (Federal) (collectively the nondefending insurers).

Each insurer insured a commercial tenant of a parcel of industrial property on Bauchet Street in Los Angeles during some portion of a period of over 30 years.[3] During that period, the tenant-insureds conducted metal plating and honing operations on the site. In 1988, the landlord sued the tenant-insureds, alleging that the tenant-insureds' operations on the property had caused environmental contamination.[4] The lawsuit was tendered to each of the

---

[2]The conclusion that each nondefending insurer had a duty to defend is derived from the extrinsic evidence issue presented on this appeal. This conclusion may be subject to resolution of further issues reserved in the trial court relating to questions such as whether the defense was timely and properly tendered, exactly which entities were insureds under which pertinent policies, and similar issues. Such issues remain open for resolution in the trial court upon remand.

[3]The form of the commercial entity operating on the leased premises changed over time. Initially the tenant-insured business was Spar-Tan Engineering. At some point Van der Horst Corporation of America (VDH) acquired Spar-Tan—the method by which this was accomplished is in dispute. R.G. Scott Corporation later purchased VDH and operated the business as R.G. Scott Corporation, also known as and doing business as Van der Horst Corporation of America (Scott/VDH). For simplicity's sake we refer collectively to these entities as "tenant-insureds."

[4]Spar-Tan Engineering was not named as a defendant in the underlying action. Unigard claims to have insured only that entity, and to have no obligation with respect to the "successor" tenant-insureds. Unigard's claims in this regard are discussed in the unpublished portion of this opinion. In the published portion we address the claims of the nondefending insurers, including Unigard, that regardless of the identity of the insured, there could be no duty to defend due to the nature of the extrinsic evidence in the insurers' possession.

insurers.[5] Each of the nondefending insurers denied a defense obligation. Appellant defending insurer, however, defended the action from shortly after tender in early 1992 until the underlying action was concluded by way of a stipulated judgment in late 1993, and allegedly incurred defense costs of over $875,000.

The defending insurer filed this action for a declaration that the nondefending insurers had a duty to defend, and hence now have a duty to contribute to defense costs. The issue was tried to the court. The trial court determined "that based upon the evidence obtained by and provided to the insurers at time of tender (and subsequently), there was no potential for coverage under any of the defendants' policies." The trial court therefore found no duty to defend, and judgment was entered for the nondefending insurers. The defending insurer appeals.

## II. THE ISSUE ON APPEAL.

To clarify the question presented, we first distinguish what is in issue on this appeal and what is not. The issue on this appeal is a limited one. It concerns certain information extrinsic to the complaint in the underlying action, which information was in the possession of the nondefending insurers. The nondefending insurers contend that this information negated their duty to defend by establishing the applicability of a policy exclusion, even though the landlord's first amended complaint alleged damages which (had they been proven) would otherwise have been covered by the policies in question.

Certain matters are not disputed, but are instead agreed or established by case law. The nondefending insurers acknowledge that the comprehensive general liability policies they issued cover "property damage" and obligate them to defend suits (against their respective insureds) which threaten potential liability for "property damage." They also acknowledge a duty to defend such a suit even if the suit is "groundless, false or fraudulent." Moreover, the nondefending insurers acknowledge that the landlord's underlying first amended complaint did allege "property damage" and did seek recovery because of "property damage."

However, the nondefending insurers contend that, based upon the extrinsic evidence in their possession, any such damages were necessarily *excluded* by

[5]Some of the insurers dispute whether they received proper tenders, but this question was not resolved in the trial court. This opinion regarding duty to defend is based on the assumption that the defense was properly tendered, although that issue remains to be litigated upon remand.

an "owned/rented property" exclusion contained in each policy. (Cf. Croskey et al., Cal. Practice Guide: Insurance Litigation (The Rutter Group 1998) ¶ 7:543, p. 7B-11 [insurer may refuse to defend where undisputed facts conclusively show that liability would be excluded under the policy].) All parties agree that the owned/rented property exclusion excludes any indemnity obligation for damage caused by the tenant-insureds to the landlord's property itself, but also agree that this exclusion does not exclude an indemnity obligation for "third party property damage" or "off-site" damage—for example, pollution of groundwater or the surface or subsurface of adjacent property.

All parties also agree that the damages eventually stipulated to in the underlying action were all attributable to on-site contamination. No off-site pollution was ever established. On a pretrial motion, the trial court applied the "owned/rented" exclusion to rule that none of insurers, including the defending insurer, were obligated to *indemnify* the tenant-insureds (or to pay the landlord), because all of the stipulated damages were for on-site contamination. That ruling was affirmed by this court on an earlier appeal.

The nondefending insurers now rely heavily on the ultimate determination that all of the damages stipulated to in the underlying action were excluded by the "owned/rented property" exclusion. However, the fact that the tenant-insureds were not ultimately found liable for covered damages—and hence were not entitled to *indemnity*—does not establish that the tenant-insureds never faced the *potential* of covered liability. Case law, discussed below, makes clear that if the tenant-insureds faced the *potential* of covered liability at the time of tender, they were entitled to a defense.

"[T]he carrier must defend a suit which *potentially* seeks damages within the coverage of the policy." (*Gray* v. *Zurich Insurance Co.* (1966) 65 Cal.2d 263, 275 [54 Cal.Rptr. 104, 419 P.2d 168], italics in original; see also Croskey et al., Cal. Practice Guide: Insurance Litigation, *supra*, ¶ 7:520 et seq., p. 7B-6 et seq.) "Implicit in this rule is the principle that the duty to defend is broader than the duty to indemnify; an insurer may owe a duty to defend its insured in an action in which no damages ultimately are awarded. [Citations.]" (*Horace Mann Ins. Co.* v. *Barbara B.* (1993) 4 Cal.4th 1076, 1081 [17 Cal.Rptr.2d 210, 846 P.2d 792]; see also Croskey et al., Cal. Practice Guide: Insurance Litigation, *supra*, ¶ 7:530, p. 7B-8. [doubts as to whether facts alleged give rise to duty to defend are resolved in insured's favor].) " 'Hence, the duty "may exist even where coverage is in doubt and ultimately does not develop." [Citation.]' " (*Montrose Chemical Corp.* v. *Superior Court* (1993) 6 Cal.4th 287, 295 [24 Cal.Rptr.2d 467, 861 P.2d

1153] (*Montrose I*).) In *Gray,* the Supreme Court said: ". . . the insurer need not defend if the third party complaint *can by no conceivable theory raise a single issue which could bring it within the policy coverage.*" (*Gray, supra,* 65 Cal.2d at p. 276, fn.15, italics added.) The *Montrose I* court explained: "The quoted language [from *Gray*] cannot reasonably be understood to refer to anything beyond *a bare 'potential' or 'possibility' of coverage* as the trigger of a defense duty." (*Montrose I, supra,* 6 Cal.4th at p. 300, italics added.)

The duty to defend is not only broad, but immediate. As the court noted in *Montrose I*: "Imposition of an immediate duty to defend is necessary to afford the insured what it is entitled to: the full protection of a defense on its behalf. [Citation.]" (*Montrose I,, supra,* 6 Cal.4th at p. 295.) Moreover, "[t]he defense duty is a continuing one, *arising on tender of defense* and lasting until the underlying lawsuit is concluded [citation], or until it has been shown that there is *no* potential for coverage . . . ." (*Ibid.,* initial italics added.)

The *Montrose I* court also noted that the facts which determine whether a defense duty exists need not be alleged in the underlying third party complaint. Facts known to the insurer at the time of tender, even if extrinsic to the third party complaint, can also defeat the duty to defend. (*Montrose I, supra,* 6 Cal.4th at pp. 295-299; see also Croskey et al., Cal. Practice Guide: Insurance Litigation, *supra,* ¶ 7:515 et seq., p. 7B-5 et seq.) The critical issue is " 'whether such evidence presents undisputed facts which *conclusively eliminate* a potential for [covered] liability.' " (*Montrose I, supra,* 6 Cal.4th at pp. 298-299, italics added.) In explaining the relative burdens of the parties in an action seeking a declaration on duty to defend, the *Montrose I* court stated: "To prevail, the insured must prove the existence of a *potential for coverage,* while the insurer must establish *the absence of any such potential.* In other words, the insured need only show that the underlying claim *may* fall within policy coverage; the insurer must prove it *cannot.* Facts merely tending to show that the claim is not covered, or may not be covered, but are insufficient to eliminate the possibility that resultant damages (or the nature of the action) will fall within the scope of coverage, therefore add no weight to the scales. Any seeming disparity in the respective burdens merely reflects the substantive law." (*Montrose I, supra,* 6 Cal.4th at p. 300, italics in original.)

In the instant case, the nondefending insurers acknowledge that the landlord's first amended complaint alleges potentially covered damages, because it alleges off-site contamination. (Cf. Croskey et al., Cal. Practice Guide: Insurance Litigation, *supra,* ¶ 7:524, pp. 7B-7 to 7B-8 [potential for

coverage determined by facts alleged].) Hence the question in this case resolves into whether the extrinsic facts relied upon by the nondefending insurers "conclusively eliminate" that potential by conclusively eliminating the possibility of off-site contamination. (See, e.g., *Montrose I, supra,* 6 Cal.4th at pp. 298-299.) If the extrinsic facts merely tend to show that *maybe* there was no off-site contamination, and that *perhaps* the landlord's alleged damages were not covered, those extrinsic facts would be insufficient to negate the duty to defend. (*Id.* at p. 300.) The extrinsic facts must completely "eliminate the possibility" that the alleged damages are covered; otherwise the extrinsic facts "add no weight to the scales." (*Ibid.*) If the extrinsic evidence goes no farther than "maybe" and "perhaps," the insurer continues to have a duty to defend, because the extrinsic evidence does not *conclusively* establish that the alleged damages "cannot" fall within the scope of coverage. (*Ibid.*) The key question in the instant case is therefore whether the extrinsic evidence on which the nondefending insurers relied at time of tender conclusively established that there was no possibility of off-site contamination. If the extrinsic evidence left open that possibility, then the nondefending insurers continued to have a duty to defend.

## III. STANDARD OF REVIEW.

■ "We uphold the trial court's findings of fact if they are supported by substantial evidence. [Citations.] The proper construction of an insurance policy is a question of law, however, which we independently review. [Citations.]" (*Bluehawk* v. *Continental Ins. Co.* (1996) 50 Cal.App.4th 1126, 1130-1131 [58 Cal.Rptr.2d 147].) Here the nondefending insurers contend that they were in possession of certain extrinsic information at the time of tender, and that this information conclusively proved the lack of any off-site contamination. The defending insurer asserts there are fact issues as to when each insurer acquired the information. However, as explained below, the extrinsic evidence was legally insufficient to *conclusively* negate the possibility of off-site contamination for several reasons, chief among them that the extrinsic evidence related only to studies of on-site (not off-site) contamination. It is therefore immaterial whether this extrinsic evidence was, or was not, in the possession of the nondefending insurers at the time of tender—they had a duty to defend in either event. The published portion of this appeal therefore involves no material factual disputes, and we review the issue of duty to defend de novo as a matter of law.

## IV. THE ALLEGATIONS IN THE LANDLORD'S COMPLAINT AND THE EXTRINSIC EVIDENCE ALLEGEDLY AVAILABLE AT THE TIME OF TENDER.

The nondefending insurers claim to have had, at the time of tender, two determinative items of extrinsic information. The first was an order issued

by the United States Environmental Protection Agency (EPA); the second was a site stabilization work plan prepared by Environ Corporation. A perusal of these two documents in comparison with the operative underlying complaint (the first amended complaint) makes it quite apparent that these two documents did not "conclusively eliminate" the potential of off-site contamination. These documents were focused on on-site contamination. Not only did they not eliminate the possibility of off-site contamination, they affirmatively suggest the existence of such contamination.

### a. The Original Underlying Complaint

The landlord's original complaint in the underlying action was filed in 1988. It alleged that the tenant-insureds had breached their lease by conducting operations on the property "so as to allow obnoxious and hazardous chemicals to accumulate on the property thereby rendering the property unsafe, unlawful and hazardous." The complaint further alleged that the tenant-insureds had caused injury to the premises by allowing "hazardous chemicals to accumulate in the soil." The complaint sought damages and injunctive relief requiring the tenant-insureds to "repair and restore the premises" to its original condition. The original complaint did not specifically allege off-site contamination.

### b. The EPA Order

Apparently the underlying action was inactive until an order was issued by the EPA (the EPA Order) on December 2, 1991, naming as "respondents" both the landlord and the tenant-insureds. The EPA Order provided: "This Order requires the respondents to undertake and complete removal activities to abate an imminent and substantial endangerment to the public health or welfare or the environment that may be presented by the actual or threatened release of hazardous substances from the above-referenced Site." The EPA Order then contained "Findings of Fact," which the EPA stated were "based on available information."

The "Findings of Fact" recited the history of the chrome plating and honing operations on the property, the history of the property's ownership, and the history of aborted hazardous waste cleanup efforts at the property. Inspections by Los Angeles County had revealed that several hundred containers containing highly acidic and toxic plating waste and substances had been left on the premises when the tenant-insureds abandoned the facility in 1989. After that time little maintenance had been conducted. The roof had leaked and there had been extensive water damage throughout the facility. The county's information led the EPA's "Emergency Response

Section" to conclude that an EPA "emergency response assessment" was necessary.

The EPA's "assessment" consisted of preparing an inventory of containers of toxic material at the site, identifying their contents, collecting samples, and making observations detailed in the EPA Order. The EPA's investigation revealed sources of toxic chemical contamination on the property both inside and outside the building. At least one large tank was identified as leaking a "chromium solution." The EPA noted "breaches in the subfloor containment." Several areas of the yard and the foundations of the building revealed chromium staining. The EPA identified and listed several chemicals found on the site as "Threats to Public Health and Welfare."

In a section of the EPA Order entitled "Threats to the Environment," the EPA stated: "There is a high potential for soil contamination beneath the plating shop building due to apparent breaches in the subfloor containment. It also appears that plating solutions have been migrating through the concrete wall for many years. *Contaminant migration to underlying soils may be extensive. [¶] A potential threat to surface waters exists due to the leakage of hazardous substances into the underlying soils from the facility. Contaminants could migrate or leach through cracks, fissures and unsealed joints and ultimately contaminate surface waters located beyond the immediate vicinity.*" As a "Conclusion of Law," the EPA found that "The presence of [the listed hazardous substances] at the above-referenced Site, and the potential for those substances to migrate, constitutes an actual or threatened 'release' of hazardous substances into the environment . . . ." (Italics added.)

In a section of the EPA Order entitled "Determinations," the EPA found: "1. The *actual or threatened release of hazardous substances from the Facility presents an imminent and substantial endangerment to the public health or welfare or the environment.* 2. The actions required by this Order . . . are appropriate to protect the public health or welfare or the environment. 3. The conditions present at the Site constitute a threat to public health or welfare or the environment based upon consideration of the [following] factors . . . ." The EPA then listed factors including: "Actual or potential exposure to hazardous substances by nearby populations, animals, or food chain"; "*Actual or potential contamination of drinking water supplies*"; and "*High levels of hazardous substances or pollutants of contaminants in soils at or near the surface that may migrate.*" (Italics added.)

Describing the threat to drinking water supplies, the EPA Order noted "[t]he existence of heavy metal and acid contamination which exists in

surface soils. It is suspected that there is significant soil contamination beneath the plating shop. *The extent and magnitude of soil contamination is not yet known.* There are drinking water wells located within one mile of the facility. Therefore, *there is a high potential for these wells to become adversely impacted by heavy metals leaching into the aquifer.*" (Italics added.) The EPA further noted: "[H]eavy metals and acid stained soil [were] detected at the facility. Soil staining observed by the On-Scene Coordinator suggests that there is a *high potential for extensive soil contamination* at the facility. Hazardous substances *may migrate* due to rainwater runoff, wind erosion or chemical leaching." (Italics added.)

The EPA Order required the respondents (the landlord and the tenant-insureds) to take numerous affirmative steps, including submitting a "Site Stabilization Plan," stating: "The immediate Site stabilization activities required consist of recontainerizing those hazardous substances in the drums, roll-off boxes and tanks that have been identified by U.S. EPA to be in poor condition." The Site Stabilization Plan was to be followed by a "Work Plan" which would deal with the "remaining removal activities ordered . . . below." The activities ordered included: "f. Conduct surface and subsurface soil sampling *to characterize the nature and extent of contamination.* [¶] g. Properly dispose of or stabilize contaminated soils *based on the soil sampling characterization as determined by EPA.*" (Italics added.)

c. *The Environ Site Stabilization Plan*

As required by the EPA Order, on December 31, 1991, a "Site Stabilization Work Plan" was submitted by Environ Corporation (the Environ Site Stabilization Plan.) The Environ Site Stabilization Plan specifically recited that it was submitted in "direct response" to the paragraph of the EPA Order which required a Site Stabilization Plan. The Environ Site Stabilization Plan made no reference to the later portion of the EPA Order which required surface and subsurface soil sampling to "characterize the nature and extent of contamination." The Environ Site Stabilization Plan dealt only with immediate removal activities to "stabilize" the site, not with ascertaining whether there was off-site contamination.[6] The "Introduction" portion of the Environ Site Stabilization Plan explained that its purpose was to "specify the work planned and the protocols that will be followed in stabilizing the Site."

d. *The Underlying First Amended Complaint*

Within a month after issuance of the EPA Order, the landlord filed a first amended complaint (FAC) in the underlying action. The FAC alleged not

---

[6]Both the EPA Order and the Environ Site Stabilization Plan did, however, contain references to the risk that contaminants could migrate off site.

only that the property itself had been polluted, but also that: "The contaminants dumped, released, stored and/or leeched [*sic*] into the ground at the Bauchet Street property, *have periodically escaped the site into the air, ground, and potentially the surface waters, and may have entered into and contaminated the ground water surrounding the Bauchet Street site*, including that used by others for drinking, bathing, agricultural, and business use." (Italics added.) The FAC contained detailed factual allegations concerning various methods by which contamination purportedly occurred. An "air wash" system allegedly periodically expelled contaminated air into the atmosphere: "This contaminated air contained particulates which would blow out over the ground surrounding the building and gradually settle on the ground, *to be ultimately leeched* [*sic*] *into the ground by rain water.*" (Italics added.) In addition, toxic liquids and powders were allegedly spilled onto the ground during transfer from containers, and further toxic spills allegedly occurred from various vats caused by overfilling, rupture, and chemical reaction. These discharges were alleged to have taken place over the entire 30-plus year period during which the tenant-insureds operated the plating business on the property. The landlord alleged that "[t]hese occasions of spillage would cause the chemical to be deposited upon the ground and ultimately leeched [*sic*] into the ground by rain water." The landlord further alleged that "[p]ollutants and contamination generated by Defendants, and each of them, have contaminated the soil on the property, *and have migrated in horizontal and vertical directions, the extent of which is presently unknown.*" (Italics added.) The landlord also alleged that the tenant-insureds' conduct "caused the toxic substance contamination of the Plaintiff's property *and environment.*" (Italics added.)

Based on these allegations, the landlord asserted causes of action for breach of contract, waste, negligence, strict liability (ultrahazardous activity), negligent infliction of emotional distress, trespass, and public nuisance, alleging further that the tenant-insureds had rendered the property "unsafe, unlawful and hazardous," and that the tenant-insureds had negligently "releas[ed] the toxic substances *into the environment* and ground at *or near* the Bauchet Property site." (Italics added.) The FAC's "public nuisance" cause of action contained an allegation that "the property is surrounded by facilities where many thousands of people work, which persons are exposed to the contamination and pollution existing on the property. The conditions on the property, as caused by Defendants, are deemed sufficiently injurious and threatening to the public health that various governmental agencies have investigated the pollution at the site and have issued various orders for abatement of the nuisance. . . . The [landlord is] claimed to be liable for costs of cleanup of said facilities." The landlord sought special and general damages according to proof, and appraisal and engineering fees.

## V. Discussion

■ The nondefending insurers concede that the FAC contains allegations of off-site contamination—damage which would not be excluded by the "owned/rented property" exclusion. The allegations of the FAC raised the potential that the tenant-insureds would be required to pay damages, not only because of on-site pollution damage, but also because of off-site pollution damage—possible pollution of the groundwater or adjoining property. (See *A-H Plating, Inc.* v. *American National Fire Ins. Co.* (1997) 57 Cal.App.4th 427, 442 [67 Cal.Rptr.2d 113].) Neither the EPA Order nor the Environ Site Stabilization Plan conclusively established the absence of off-site contamination.

Aside from certain issues reserved by the trial court,[7] and Unigard's contention that it did not insure any defendant facing liability in the underlying action (addressed in the unpublished portion of this opinion), each of the nondefending insurers relied solely on the "owned/rented property" exclusion to negate coverage.[8] After reciting the terms of the "owned/rented property" exclusion, the trial court stated: "Based on the absence of any groundwater contamination alleged in the *original* underlying complaint (filed May 26, 1988), and the Complaint's reference to soil-only contamination, the court found that coverage is precluded by the owned property exclusion. The court now finds that based upon the evidence obtained by and provided to the insurers at the time of tender (and subsequently), there was no potential for coverage under any of the defendants' policies. The defendants' declinations were proper under *Montrose Chemical Corp.* v. *Superior Court* (1993) 6 Cal. 4th 287, 301 . . . ."

Although the trial court referred to the "original" underlying complaint, the nondefending insurers admit that the landlord's underlying FAC "alleg[es] off-site contamination." The nondefending insurers contend, however, that "[t]he extrinsic evidence presented to [the nondefending insurers] at the time of the tender of the underlying action revealed no third-party contamination." This "extrinsic evidence" was the EPA Order and the Environ Site Stabilization Plan. The fact that the EPA Order and the Environ Site Stabilization Plan "revealed no third-party contamination" is consistent with their purpose. They were focused entirely on the site itself. They included no study of whether there was off-site contamination. Instead, the EPA Order merely noted the possibility of off-site contamination.

---

[7] See footnotes 2 and 5, *ante.*

[8] The judgment recites that it was also based in part on Federal's "pollution" exclusion. In light of this court's prior ruling that the pollution exclusion did not apply to preclude an indemnity obligation, Federal tacitly concedes in this appeal that the pollution exclusion would not apply to preclude a defense obligation.

Moreover, the fact that these documents did not "reveal" off-site contamination is immaterial, because that is not the test for duty to defend. The test for duty to defend (insofar as extrinsic evidence is concerned) is not whether an insurer has extrinsic evidence which "reveals" a covered liability, but rather whether the insurer has extrinsic evidence which " 'presents undisputed facts which *conclusively eliminate* a potential for liability.' " (*Montrose I, supra,* 6 Cal.4th 287 at pp. 298-299, italics added.) Clearly the EPA Order and the Environ Site Stabilization Plan did not *conclusively eliminate* the possibility of off-site contamination. Instead, they simply did not deal with the subject of off-site contamination. The nondefending insurers' contention that the EPA Order and the Environ Site Stabilization Plan "both . . . clearly document the absence of off-site contamination" is simply not true.[9] Hence, since off-site contamination was alleged in the landlord's FAC, the nondefending insurers had a duty to defend.

The nondefending insurers alternatively rely on a classic "hindsight" argument, stating for example: "The EPA never ordered the remediation or investigation of groundwater or off-site property and, thus, there was no duty to defend based upon the owned property exclusion at the time of Federal's declinations of tender." That the EPA would eventually not require off-site remediation was not known at the time of tender. The *Montrose I* court quoted with approval from *Saylin* v. *California Ins. Guarantee Assn.* (1986) 179 Cal.App.3d 256, 263 [224 Cal.Rptr. 493]: " '[F]or an insurer, the existence of a duty to defend turns not upon the ultimate adjudication of coverage under its policy of insurance, *but upon those facts known by the insurer at the inception of the third party lawsuit.* [Citation.]' " (*Montrose I, supra,* 6 Cal.4th at p. 295, italics added; see also Croskey et al., Cal. Practice Guide: Insurance Litigation, *supra,* ¶ 7:589, p. 7B-22 [insurer cannot rely solely on result of third party action against insured to show absence of potential coverage and hence to justify entire refusal to defend].) Moreover, the lawsuit the nondefending insurers were being asked to defend was not brought by the EPA, but by the landlord. The damages requested in the landlord's FAC were not necessarily limited to reimbursement for remediation ordered by the EPA. Thus the assertion that a duty to defend did not arise because the EPA ultimately did not require remediation of off-site contamination is not only hindsight, but hindsight misapplied.

The nondefending insurers also attempt to avoid a duty to defend by attacking the landlord's FAC as "fraudulent" or a "sham." This argument is

---

[9]Even an additional report, prepared by Bechtel later in 1992, did not "clearly document the absence of off-site contamination." All the Bechtel report said about off-site contamination was that contamination which could be linked to the insured had not turned up in drinking water wells three to four miles away, nor had it been detected in *prior* groundwater sampling, performed four to six years before the report, in monitoring wells closer to the site, that by the time of the Bechtel report could no longer be located.

based upon two facts: 1) the original complaint (filed more than three years earlier) had not specifically alleged off-site contamination; and 2) when forwarding the FAC, the landlord's counsel commented that the complaint had been amended "to conform to California law." The trial court relied on these facts to conclude that the landlord's FAC was "fraudulent." Even if that conclusion was correct, it could not absolve the nondefending insurers from their obligation to defend the tenant-insureds. The policies involved here all contain the standard clauses in which the insurer promises to defend the insured even if the lawsuit is "groundless, false or fraudulent."

In this vein, the *Montrose I* court recognized the "well-established principle that the insurer may not decline to defend a suit merely because it is devoid of merit, but instead must assert appropriate defenses on its insured's behalf in the underlying action." (*Montrose I, supra,* 6 Cal.4th at p. 298.) *Montrose I* quoted from *Lee* v. *Aetna Casualty & Surety Co.* (2d Cir. 1949) 178 F.2d 750, 752: "The insurer has promised to relieve the insured of the burden of satisfying the tribunal where the suit is tried, that the claim as pleaded is 'groundless.' " (See also *Waller* v. *Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 19 [44 Cal.Rptr.2d 370, 900 P.2d 619]: "This duty [to defend], which applies even to claims that are 'groundless, false, or fraudulent,' is separate from and broader than the insurer's duty to indemnify.") Thus even assuming that the facts enumerated above were sufficient to establish that the landlord's FAC was "fraudulent" or a "sham," the nondefending insurers nevertheless were obligated to defend these claims inasmuch as they had specifically agreed to defend suits seeking potentially covered damages even if those suits were "groundless, false or fraudulent."[10] (See also Croskey et al., Cal. Practice Guide: Insurance Litigation, *supra,* ¶ 7:522 et seq., p. 7B-7.)

Even while acknowledging the allegations of off-site contamination in the FAC, the nondefending insurers complain that the plaintiff landlord did not provide them with "evidence of such contamination," and that the tenant-insureds did not provide "facts to substantiate the allegations contained in the First Amended Complaint." For purposes of the duty to defend, which is immediate, the important point is that the FAC alleged potentially covered liability. The insurers must defend a suit seeking damages potentially covered under the policy even if that suit is "groundless, false or fraudulent." The nondefending insurers understandably cite no authority for the proposition that either an insured or a third party claimant is required to provide the insurer with evidence that its insured is in fact liable before the insurer is

---

[10]There is no contention of collusion or conspiracy between the landlord and the tenant-insureds.

required to defend. The nondefending insurers' contentions in this regard are immaterial.[11] If the complaint alleges damages potentially covered by the policy, the insurer is not entitled to decline to defend until either the insured or the underlying plaintiff proves to the insurer's satisfaction that the insured is indeed liable on a covered theory. "The determination whether the insurer owes a duty to defend usually is made in the first instance by comparing the allegations of the complaint with the terms of the policy." (*Horace Mann Ins. Co.* v. *Barbara B., supra*, 4 Cal.4th at p. 1081.) "To defend meaningfully, the insurer must defend immediately." (*Buss* v. *Superior Court* (1997) 16 Cal.4th 35, 49 [65 Cal.Rptr.2d 366, 939 P.2d 766].) "Imposition of an immediate duty to defend is necessary to afford the insured what it is entitled to: the full protection of a defense on its behalf." (*Montrose I, supra*, 6 Cal.4th at p. 295.)

The nondefending insurers also incorrectly rely on *Hurley Construction Co.* v. *State Farm Fire & Casualty Co.* (1992) 10 Cal.App.4th 533 [12 Cal.Rptr.2d 629]. The underlying suit in *Hurley* did not allege either "bodily injury" or "property damage." The insured's counsel nevertheless argued that a defense duty existed because the complaint might later be amended. It was in this context that the *Hurley* court stated: "[T]he insured may not speculate about unpled third party claims to manufacture coverage." (*Id.* at p. 538.) Here the landlord's FAC did allege off-site property damage. The fact that off-site property damage was not yet proven does not mean that the insured was speculating about "unpled" claims.

It is correct, as the nondefending insurers assert, that a third party plaintiff is not the arbiter of the policy's coverage. However, contrary to defendant's assertion, *Gunderson* v. *Fire Ins. Exchange* (1995) 37 Cal.App.4th 1106 [44 Cal.Rptr.2d 272], does not hold that the allegations of a third party complaint can be ignored because of, or be "outweighed" by, extrinsic evidence. In *Gunderson*, the complaint simply did not state any claim for "property damage." In this context, the *Gunderson* court stated: "An insured may not trigger the duty to defend by speculating about extraneous 'facts' regarding potential liability or ways in which the third party claimant might amend its complaint at some future date. . . . Thus, the issues here are what facts [the insurer] knew at the time appellants tendered the defense of the [underlying] lawsuit, *both* from the allegations on the face of the third party complaint, and from extrinsic information available to it at the time; and whether these *known facts* created a potential for coverage under the terms of the Policy." (*Id.* at p. 1114, initial italics added.)

---

[11]The *nondefending* insurers do not allege any breach of the policies' "cooperation clauses," as, for example, by refusal to provide information to the insurer.

The fact that it was eventually established that no portion of the stipulated judgment in the underlying action was covered does not conflict with the conclusion that a defense duty was owed at the earlier time of tender. It only demonstrates the well-recognized distinction between the scope of a duty to defend and the scope of a duty to indemnify. Years after the defense tender, the action was terminated by a stipulated judgment relating wholly to on-site contamination. That fact does not retrospectively establish that the tenant-insureds had no exposure to a recovery for off-site contamination at the earlier time of tender.[12] Whether there was, or was not, off-site contamination was unknown at the time of tender. The defense duty issue concerns whether the tenant-insureds faced potential liability covered by the policies, not whether that liability ever actually materialized. "An insurer may have a duty to defend even when it ultimately has no obligation to indemnify, either because no damages are awarded in the underlying action against the insured or because the actual judgment is for damages not covered under the policy." (*Borg* v. *Transamerica Ins. Co.* (1996) 47 Cal.App.4th 448, 454 [54 Cal.Rptr.2d 811].) "[W]hen a suit against an insured alleges a claim that 'potentially' or even 'possibly' could subject the insured to liability for covered damages, an insurer must defend unless and until the insurer can demonstrate by reference to 'undisputed facts' that the claim cannot be covered. [Citations.]" (*Vann* v. *Travelers Companies* (1995) 39 Cal.App.4th 1610, 1614 [46 Cal.Rptr.2d 617].) This obligation can be excused only when the third party complaint " 'can by no conceivable theory raise a single issue which could bring it within the policy coverage.' " (*Montrose I, supra,* 6 Cal.4th 287, 300, italics omitted.)

The documentation available to the nondefending insurers at the time of tender, the EPA Order and the Environ Site Stabilization Plan, even if considered to be "undisputed facts," simply did not conclusively demonstrate that there was no off-site contamination. The trial court's finding to the contrary was erroneous and must be reversed.

VI. THE JUDGMENT IN FAVOR OF UNIGARD, TO THE EXTENT IT RESTS ON OTHER GROUNDS, MUST ALSO BE REVERSED.*

. . . . . . . . . . . . . . . . . . . . . . . .

[12]Respondent Home's statement that the EPA Order and the Environ Site Stabilization Plan were "the same evidence, and evidence of the same quality, relied upon by the moving parties (including Home), the trial court, and this court with respect to the summary judgment determination of 'no coverage' " is misleading. Those documents were only part of the evidence, and by the time of the indemnity adjudication, the underlying action had been terminated by a stipulated judgment.

*See footnote, *ante,* page 1030.

## VII. DISPOSITION

The judgment is reversed and remanded for determination of the reserved or remaining issues consistent with this opinion. Costs to appellant.

Boren, P. J., and Nott, J., concurred.