**TRAVELERS CASUALTY AND SURETY COMPANY, formerly known as The Aetna Casualty and Surety Company, Plaintiff,**

v.

**AMERICAN INTERNATIONAL SURPLUS LINES INSURANCE COMPANY, and Does 1 through 10, inclusive, Defendants.**

No. 05CV0076–LAB (BLM).

United States District Court,
S.D. California.

March 29, 2006.

Sandra P. Llaneta, Summers and Shives, San Diego, CA, for Plaintiff.

Mary P. McCurdy, McCurdy and Fuller, Menlo Park, CA, for Defendants.

## ORDER RE CROSS–MOTIONS FOR SUMMARY JUDGMENT

BURNS, District Judge.

This matter is before the court on the cross-motions for summary judgment of plaintiff Travelers Casualty and Surety Company ("Travelers") and of defendant American International Surplus Lines Insurance Company ("AISLIC"). AISLIC removed Travelers' action for subrogation and equitable contribution from state to federal court in November 2005 on the basis of diversity jurisdiction. Pursuant to Civil Local Rule 7.1(d)(1), the court finds the issues appropriate for decision on the papers and without oral argument. For the reasons discussed below, AISLIC's motion is **DENIED**, and Travelers' motion is **GRANTED**.

## I. BACKGROUND

AISLIC issued two primary Commercial General Liability ("CGL") policies to Daley

Corporation ("Daley"), as its named insured, one for the period May 1, 1991 to May 1, 1992 and one for the period May 1, 1992 to May 1, 1993, to cover third party claims of property damage as a result of an occurrence during the policy period.[1] A policy endorsement committed Daley to a $25,000 per occurrence self-insured retention ("SIR"). Daley performed grading operations for a condominium construction project ("the Project") under a contract with 4S Investment Partners ("4S"). AISLIC added an endorsement to each of the Daley policies naming 4S as an "Additional Insured" for liability arising out of Daley's work.

In about March 2001, the Project's homeowners' association filed a lawsuit in San Diego County Superior Court, *17161 Alva Road Owners Ass'n v. Anderson, Inc.*, Case No. 763422, alleging various construction defects (the "Underlying Action"). 4S was named as a defendant in that suit on March 19, 2002. 4S named Daley, among others, in a cross-complaint. Daley had filed for Chapter 11 bankruptcy relief in about April 1998 and could not pay the AISLIC policies' SIR. AISLIC nevertheless defended Daley in the Underlying Action and paid for settlement of the cross-claims against Daley, taking an SIR-equivalent $25,000 "credit" *in lieu* of Daley's actual payment of the $25,000 SIR, by deducting that amount from Daley's $52,500 settlement obligation.

■ Travelers had issued a "Commercial Excess Liability (Umbrella)" policy to 4S for the period November 30, 1995 to November 30, 1996 ("Travelers' Policy"). 4S tendered its defense to Travelers when it was served with the complaint in the Underlying Action. Travelers accepted the tender, under a reservation of rights,[2] and defended 4S through a settlement and dismissal of the Underlying Action.[3] No later than January 29, 2003, 4S also tendered its defense in the Underlying Action to AISLIC as an additional insured under Daley's policies. In correspondence dated July 22, 2003, AISLIC acknowledged 4S was an additional insured, but declined to participate in 4S's defense on the grounds that the unsatisfied SIR and certain policy exclusions purportedly precluded coverage. Compl. Exh. C. Despite having defended Daley, AISLIC takes the position that inasmuch as Daley was unable to pay from its own assets the $25,000 SIR prerequisite to triggering coverage obligations, and by its terms the SIR endorsement prohibited other insurance from satisfying the SIR, no duty to defend or indemnify 4S was triggered.

Travelers initiated this lawsuit seeking subrogation or equitable contribution for expenses it incurred to defend 4S in the Underlying Action, on grounds AISLIC was "solely responsible and obligated to

---

1. The AISLIC policies define an "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful condition." Johnson Decl. Exh. C § V ¶ 9, Exh. D § V ¶ 9. An "occurrence" policy covers claims based on injuries or damage during the policy period even if the claim is not made until after the policy expires. *See Gilliam v. American Cas. Co. of Reading, Pa,* 735 F.Supp. 345, 349, fn. 4 (N.D.Cal.1990). Whether the basic insuring clause of a CGL policy has been triggered by property damage may be a different issue. *See Westoil Terminals Co. v. Industrial Indem.*

*Co.,* 110 Cal.App.4th 139, 147–48, 1 Cal. Rptr.3d 516 (2003).

2. An insurer paying the costs of defending and settling a claim against the insured has a direct cause of action against other insurers on the risk, independent of any right or claim by the insured. *Fireman's Fund Ins. Co. v. Maryland Cas. Co.,* 65 Cal.App.4th 1279, 1288–89, 77 Cal.Rptr.2d 296 (1998).

3. The date of the settlements is not readily ascertainable from the pleadings or motion papers.

pay, by virtue of the terms of [its primary] policies and the Travelers' umbrella policy, for the defense of 4S Partners in the underlying action," entitling Travelers' to shift to AISLIC the legal expenses it incurred. Compl. ¶¶ 18–20. Alternatively, Travelers contends it was compelled to pay a disproportionate share of 4S's defense as a consequence of AISLIC's refusal to participate, entitling it to equitable contribution from AISLIC. Compl. ¶¶ 22–24–20.

Travelers moves for summary judgment on grounds: the Travelers' umbrella policy contains a provision that it has no duty to defend 4S in a "suit" if any other insurer has a duty to defend; AISLIC had a duty to defend 4Sunder the AISLIC policy and wrongfully refused to participate in 4S's defense primarily because Daley was unable to satisfy the AISLIC policies' $25,000 SIR while in Chapter 11 bankruptcy; AISLIC owed 4S the same $25,000 SIR "credit" it gave Daley; the SIR endorsement does not apply to defense costs; AISLIC's position violates CAL. INS. CODE § 11580; AISLIC's interpretation of the SIR makes it impossible to satisfy and therefore unenforceable and a disfavored "escape clause"; and the "owned property" exclusion (also cited by AISLIC in rejecting 4S's defense) does not apply.

AISLIC moves for summary judgment on grounds: Travelers' cannot establish AISLIC had a duty to defend 4S under its policies; the SIR endorsement is enforceable; Daley did not satisfy the SIR; no "waiver" argument can override the plain language of its policies; and the amount of damages Travelers seeks is a factual determination inappropriate for summary adjudication.

## II. DISCUSSION

### A. *Legal Standards*

#### 1. *Summary Judgment*

Summary judgment is appropriate if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c) (emphasis added); *see Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 919 (9th Cir.2001). "At this stage of the proceeding, the court is not permitted to weigh the evidence, pass on credibility, or speculate as to the ultimate findings of fact." *Time Oil Co. v. Cigna Property & Cas. Ins. Co.*, 743 F.Supp. 1400, 1416 (W.D.Wa.1990), *citing Aronsen v. Crown Zellerbach*, 662 F.2d 584, 591 (9th Cir.1981).

Merely because the parties file cross-motions "does not necessarily mean that there are no disputed issues of material fact and does not necessarily permit the judge to render judgment in favor of one side or the other." *Starsky v. Williams*, 512 F.2d 109, 112 (9th Cir.1975). "[E]ach motion must be considered on its own merits." *Fair Housing Council of Riverside County, Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir.2001) (citation omitted). The moving party bears the initial burden of demonstrating the absence of a "genuine issue of material fact for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A defendant seeking summary judgment carries its burden to show that a cause of action has no merit if that party demonstrates one or more elements of the cause of action cannot be established or there is a complete defense to that cause of action. *Hartford Cas. Ins. Co. v. Mt. Hawley Ins. Co.*, 123 Cal.App.4th 278, 286, 20 Cal.Rptr.3d 128 (2004), *rev. den* (Jan 12, 2005).

The threshold issue here is whether AISLIC had a duty to defend 4S in the Underlying Action. The facts material to that issue are generally not disputed.

Each side relies on differing interpretations of policy language and its legal effect to urge summary judgment in its favor.

### 2. *Contract Interpretation*

■ Contract interpretation is a legal issue to be resolved by the court.[4] When a contract is not ambiguous, summary judgment may be entered based on the court's interpretation of clear and unambiguous provisions which present only questions of law.[5] *See United States v. Sacramento Municipal Utility District,* 652 F.2d 1341, 1344 (9th Cir.1981). The rules of contract interpretation apply equally to coverage provisions and endorsement provisions.

> When determining whether a particular policy provides a potential for coverage and a duty to defend, we are guided by the principle that interpretation of an insurance policy is a question of law. The rules governing policy interpretation require us to look first to the language of the contact in order to ascertain its plain meaning or the meaning a layperson would ordinarily attach to it. Thus, in determining whether allegations in a particular complaint give rise to coverage under a CGL policy, courts must consider both the occurrence language in the policy and the endorsements broadening coverage, if any....

*Waller v. Truck Ins. Exchange Inc.,* 11 Cal.4th 1, 18, 44 Cal.Rptr.2d 370, 900 P.2d 619 (1995) (citations omitted).

■ Liability policies are presumed to include a defense obligation unless the duty is excluded by clear and unambiguous language. *Maryland Cas. Co. v. Nationwide Ins. Co.,* 65 Cal.App.4th 21, 30–31, 76 Cal.Rptr.2d 113 (1998). An insurer's duty to defend is broader than its duty to indemnify. *Horace Mann Ins. Co. v. Barbara B.,* 4 Cal.4th 1076, 1081, 17 Cal.Rptr.2d 210, 846 P.2d 792 (1993); *Certain Underwriters at Lloyd's of London v. Sup. Ct.,* 24 Cal.4th 945, 958, 103 Cal.Rptr.2d 672, 16 P.3d 94 (2001) (the duty to defend "entails the rendering of a service, *viz.,* the mounting and funding of a defense," and "may arise as soon as damages are sought in some amount," whereas the duty to indemnify "can only arise after damages are fixed in their amount") (citations omitted). The insurer's defense duty applies to the defined "insured(s)" as well as to "additional insureds" added by endorsement. *Maryland Cas.,* 65 Cal.App.4th at 29–30, 76 Cal.Rptr.2d 113.

■ The defense obligation is not affected by policy language that limits indemnification only to the extent the additional insured is "held liable" for the named insured's acts or omissions, because such language applies to limitations on indemnity, not limitations on defense. *Maryland Cas.,* 65 Cal.App.4th at 30, 76 Cal.Rptr.2d 113; *see Uhrich v. State Farm Fire & Cas. Co.,* 109 Cal.App.4th 598, 622, 135 Cal.Rptr.2d 131 (2003), *rev. den.* (Sept. 24, 2003); *Foster–Gardner, Inc. v. National Union Fire Ins. Co.,* 18 Cal.4th 857, 869, 77 Cal.Rptr.2d 107, 959 P.2d 265 (1998) (the insurer must defend "when the policy is ambiguous and the insured would reasonably expect the insurer to defend ... against the suit based on the nature and kind of risk covered by the policy or when the underlying suit potentially seeks damages within the coverage of the policy").

---

4. The court relies on the discussions in Croskey, *et al.,* Rutter Group, Insurance Litigation (2005).

5. "An insurance policy provision will be considered ambiguous when it is capable of two or more constructions, both of which are reasonable." *Waller v. Truck Ins. Exchange Inc.,* 11 Cal.4th 1, 18, 44 Cal.Rptr.2d 370, 900 P.2d 619 (1995).

■ The duty to defend turns on those facts known by the insurer at the inception of a third party lawsuit, not whether the third party ultimately prevails against the insured in the lawsuit.[6] *Montrose Chem. Corp. v. Super.Ct.*, 6 Cal.4th 287, 295, 300, 24 Cal.Rptr.2d 467, 861 P.2d 1153 (1993) (a defense is excused only when "the third party complaint can by no conceivable theory raise a single issue which could bring it within the policy coverage") (citation omitted). "If the terms of the policy provide no potential for coverage … the insurer acts properly in denying a defense." *Wausau Underwriters Ins. Co. v. Unigard Security*, 68 Cal. App.4th 1030, 1036, 80 Cal.Rptr.2d 688 (1998); *Waller*, 11 Cal.4th at 25–26, 44 Cal.Rptr.2d 370, 900 P.2d 619. However, the "carrier **must defend a suit which *potentially* seeks damages within the coverage of the policy.**" *Gray v. Zurich Ins. Co.*, 65 Cal.2d 263, 275, 54 Cal.Rptr. 104, 419 P.2d 168 (1966) (emphasis added). Even if only a single claim in a multi-count complaint is potentially covered, the insurer normally must defend the entire action. *Buss v. Sup.Ct. (Transamerica Ins. Co.)*, 16 Cal.4th 35, 48, 65 Cal.Rptr.2d 366, 939 P.2d 766 (1997). Any doubt as to whether the facts give rise to a duty to defend is resolved in the insured's favor. *Horace Mann Ins.*, 4 Cal.4th at 1081, 17 Cal. Rptr.2d 210, 846 P.2d 792; *B & E Convalescent Ctr. v. State Comp. Ins. Fund*, 8 Cal.App.4th 78, 99–100, 9 Cal.Rptr.2d 894 (1992) ("If the coverage provisions in any policy are unclear or the exclusions are ambiguous, so that a reasonable purchaser of the policy would not realize that the risk is excluded and thus would reasonably ex-

pect the insurer to furnish a defense, a defense is required").

■ In summary, when language in an insurance policy is clear and explicit, that language controls construction and enforcement of the contract. The words used are to be interpreted according to their plain and ordinary meaning. Before finding policy language is ambiguous, coverage provisions must be construed in the context of the policy as a whole and the circumstances of the case, rather than in the abstract. The question whether a particular phrase is ambiguous in the context and circumstances must be answered through the eyes of a reasonable person in the position of the insured. *St. Paul Mercury Ins. Co. v. Frontier Pacific Ins. Co.*, 111 Cal.App.4th 1234, 1243, 4 Cal.Rptr.3d 416 (2003).

### B. Pertinent Policy Provisions

#### 1. AISLIC Policy Provisions

AISLIC insured Daley under Commercial General Liability ("CGL") policies: No. GL 7700–738 (May 1, 1991 to May 1, 1992) and No. GL 7700–239 (May 1, 1992 to May 1, 1993) in general aggregate coverage limits in excess of $2,000,000. Johnson Decl. Exhs. C, D. Each of the twelve pages of Coverage Form text bears the imprint: "Copyright Insurance Services Office, Inc. ['ISO']."[7] Johnson Decl. Exhs. C, D. The endorsements adding 4S as an "Additional Insured" are ISO CG 20 10 11 85 "Form B: Additional Insured—Owners, Lessees Or Contractors," expressly incorporating the Additional Insured into policy "Section II, WHO IS AN INSURED," circumscribed only by the limitation: "but

---

6. There of course can be no dispute AISLIC was fully aware of the claims in the Underlying Action inasmuch as AISLIC defended and indemnified Daley as a cross-defendant in that action. The issue of 4S's tender of defense is addressed below.

7. Both the AISLIC policies bear the notation they are the CG 00 01 11 88 (the 1988 amended form) version. Policy interpretation accordingly can be guided by the interpretive literature the ISO publishes to explain the underwriting intent of each provision.

only with respect to liability arising out of [Daley's] work for that insured by or for you." Johnson Decl. Exh. E. The SIR Endorsements do not bear an ISO identifier.

### a. *Defense And Indemnity Provisions*

Each of the AISLIC policies provides, in pertinent part:

### SECTION I COVERAGES

. . . . .

1. Insuring Agreement.

 a. We will pay those sums that the insured becomes legally obligated to pay as damages because of . . . "property damage" to which this insurance applies. We will have the right and duty to defend any "suit" seeking those damages. We may at our discretion investigate any "occurrence" and settle any claim or "suit" that may result. But:

 (1) The amount we will pay for damages is limited as described in LIMITS OF INSURANCE (SECTION III), and

 (2) Our right and duty to defend end when we have used up the applicable limit of insurance *in the payment of judgments or settlements* . . .

. . . . .

2. Exclusions.

 This insurance does not apply to:

 j. "Property Damage" to:

 (1) Property you own, rent, or occupy; . . .

. . . . .

### SECTION IV COMMERCIAL GENERAL LIABILITY CONDITIONS

1. Bankruptcy.

 Bankruptcy or insolvency of the insured . . . will not relieve us of our obligations under this Coverage Part.

. . . . .

4. Other Insurance.

 If other valid and collectible insurance [8] is available to the insured for a loss we cover under Coverages A or B of this Coverage Part, our obligations are limited as follows:

 a. Primary Insurance.

 This insurance is primary except when b. below applies. If this insurance is primary, our obligations are not affected unless any of the other insurance is also primary. Then we will share with all that other insurance by the method described in c. below.

 b. Excess Insurance.[9]

. . . . .

 When this insurance is excess, we will have no duty under Coverage A or B to defend any claim or suit that any other insurer has a duty to defend. If no other insurer defends, we will undertake to do so, but we will be entitled to the insured's rights against all those other insurers.

 When this insurance is excess over other insurance, we will pay only our share of the amount of the loss, if any, that exceeds the sum of

---

**8.** "The term 'other valid and collectible insurance' simply means another policy which is legally valid and underwritten by a solvent carrier." *Vons Companies, Inc. v. U.S. Fire Ins. Co.*, 78 Cal.App.4th 52, 63, 92 Cal. Rptr.2d 597 (2000) (citation omitted).

**9.** The "Excess Insurance" section describes three conditions when the AISLIC insurance will be deemed "excess over any of the other insurance" on the risk, none of which apply to this situation. The only argument that the AISLIC policy is "excess" rather than "primary" arises in connection with the construction of the SIR endorsement.

(1) The total amount that all such other insurance would pay for the loss in the absence of this insurance;

(2) The total of all deductible and self-insured amounts under all that other insurance.

We will share the remaining loss, if any, with any other insurance that is not described in this Excess Insurance provision and was not bought specifically to apply in excess of the Limits of Insurance shown in the Declarations of *this Coverage* Part.

c. Method of Sharing

If all of the other insurance permits contribution by equal shares, we will follow this method also. Under this approach, each insurer contributes equal amounts until it has paid its applicable limit of insurance or none of the loss remains, whichever comes first.

· · · · ·

13. "Suit" means a civil proceeding in which damage because of ... property damage ... to which this insurance applies are alleged.

Johnson Decl. Exhs. C, D, p. 3 of 12, pp. 7–8 of 12 (emphasis added).

b. *Self–Insured Retention Provision*

Each of Daley's AISLIC policies contains a SIR provision. The May 1991–May 1992 SIR endorsement provides, in pertinent part:

1. ...The retention amount on this policy is: ... B. $25,000 per occurrence.

· · · · ·

3. In the event that there is any other insurance, whether or not collectible, applicable to an "occurrence," claim or suit *within the retention amount,* you will continue to be responsible for the full retention amount before the limits of insurance under this policy apply.

4. The company's obligation to pay damages on behalf of the insured applies only to the amount of damage in excess of the retention amount stated in Section # 1 of this endorsement.

5. This policy does not apply and the company has no duty or obligation under the policy to provide investigation *or defense for damages within the retention amount* stated in Section # 1 of this endorsement. The company shall have the right, but not the duty to make any investigations it deems necessary, but has no obligation to defend such claims or suits [*i.e.*, those within the retention amount].

We shall have the right but not the duty to participate with you at our own expense in the defense or settlement of any claim or suit seeking damages covered under this policy. In the event of a claim or suit which in our reasonable judgement may result in payments, including supplementary payments, in an amount in excess of the retention amount, we may assume control of the defense or settlement of such claim or suit. You will continue to be responsible for the payment of the retention amount.

The company shall not be obligated to advance any amounts within the retention amount that the insured may be legally obligated to pay, however, the company, while retaining all rights to defend suits under this policy, may advance sums in the defense of any claim or claims. In the event such funds are advanced the insured shall immediately reimburse the company upon demand.

· · · · ·

9. THE FOLLOWING CONDITIONS APPLY TO THIS ENDORSEMENT, IF MARKED BY AN "X":

. . . . .

B. The limits of liabilities stated in the Declarations of this policy ... does not include the retention amount stated in the schedule.

. . . . .

E. The retention amount includes all "claim costs." [10]

. . . . .

Johnson Decl. Ex. C (emphasis added).

The May 1992–May 1993 AISLIC policy SIR endorsement provides, in pertinent part:

1. In consideration of the premium charged, it is agreed that the Limits of Insurance for each of the coverages provided by the policy will apply excess of $25,000 Self–Insured Retention (hereinafter referred to as the "Retention Amount").

The Retention Amount

(a) shall apply only to "occurrences" covered under this policy; and

(b) shall apply separately to each "occurrence"; and

(c) shall include all amounts under the Supplemental Payments section of the policy....

Your bankruptcy, insolvency or inability to pay the Retention Amount shall not increase our obligations under this policy.

. . . . .

4. We shall have the right but not the duty to participate with you at our own expense in the defense or settlement of any claim or suit seeking damages covered under this policy. In the event of a claim or suit which in our reasonable judgment may result in payments, including Supplementary Payments, in an amount in excess of the Retention Amount, we may assume control of the defense or settlement of such claim or suit. You will continue to be responsible for the payment of the Retention Amount.

5. In the event there is any other insurance, whether or not collectible, applicable to an "occurrence," claim or suit within the Retention Amount, you will continue to be responsible for the full Retention Amount before the Limits of Insurance under this policy apply.

Johnson Decl. Exh. D (emphasis added).

### c. *Effect Of Bankruptcy*

"SECTION IV —COMMERCIAL GENERAL LIABILITY CONDITIONS. 1. Bankruptcy. Bankruptcy or insolvency of the insured or of the insured's estate will not relieve us of our obligations *under this Coverage Part.*" Johnson Exh. C, p. 7 of 12, Exh. D, p. 7 of 12.

### d. *Additional Insured Endorsement*

Both of Daley's AISLIC policies incorporated an endorsement that modifies the Commercial General Liability Coverage part to add 4S Partners as an additional insured. Each of those endorsements provides, in pertinent part:

---

**10.** "Claims Costs" is defined in the SIR endorsement, in pertinent part, as: "All expenses associated with the investigation, **defense**, and settlement of any claim ...." Accordingly, from the face of the text, the $25,000 SIR was intended to be satisfied when defense costs or some combination of defense and damages sums exceeded the SIR for a particular occurrence. The court accordingly rejects Travelers' contention: "the SIR endorsement applies only to indemnity, **not to defense costs**. Nowhere in the SIR endorsement is there any mention of its application to defense costs." Travelers' P & A 10:21–23 (emphasis in text).

WHO IS AN INSURED (Section II) [only] is amended to include as an insured the person or organization show in the schedule [*i.e.*, 4S Partners], but only with respect to the liability arising out of "your [*i.e.*, Daley's] work" for that insured by or for you.

. . . . .

*WAIVER OF SUBROGATION.* IT IS HEREBY DECLARED AND AGREED THAT AI SURPLUS LINES, INC. WAIVES ALL RIGHT OF SUBROGATION *AGAINST* 4S PARTNERS, A CALIFORNIA LIMITED PARTNERSHIP, BUT ONLY AS RESPECTS THE NAMED OPERATION AT: 4S RANCH ...

*See* Johnson Decl. Exh. E (emphasis added).

### 2. *Travelers' Commercial Excess Liability Policy*

Travelers' "Commercial Excess Liability (Umbrella) Insurance" policy is provided as Diemer Declaration Exhibit 2, TRV00274–284. That policy on its face issued as and provides for "umbrella" or "excess," *i.e.*, secondary, coverage. The policy provides, in pertinent part (emphasis added):

SECTION I COVERAGES

COVERAGE A. BODILY INJURY AND PROPERTY DAMAGE LIABILITY; ...

1. INSURING AGREEMENT.

a. We will pay on behalf of the insured the "ultimate net loss" in excess of the "applicable underlying limit" which the insured becomes legally obligated to pay as damages because of ... property damage... to which this insurance applies....

2. DEFENSE OF CLAIMS OR SUITS

a. We will have *no duty* to defend any claim or "suit" that any other insurer has a duty to defend. If we elect to join in the defense of such claims or "suits", we will pay all expenses we incur.

b. We will have *the right and duty to defend* any "suit" for damages which are payable under Coverages A or B (including damages wholly or partly within the "retained limit") but which are not payable by a policy of "underlying insurance", or any other available insurance, because:

(1) Such damages are not covered; or

(2) The "underlying insurance" has been exhausted by the payment of claims.

. . . . .

d. Our right and duty in b. above end when we have used up the "applicable limit of insurance" in the payment of judgments or settlements.

e. We will pay, with respect to any claim or "suit" we defend in b. above:

(1) All expenses we incur.

. . . . .

(4) All costs taxed against the insured in the "suit".

(5) All interest in the full amount of any judgment that accrues after entry of the judgment and before we have:

. . . . .

(a) paid, or offered to pay; or

(b) deposited in court;

the part of the judgment that is within the "applicable limit of insurance."

These payments will not reduce the limits of insurance.

10. OTHER INSURANCE.

This insurance is excess over other valid and collectible insurance whether such other insurance is stated to be primary, contributing, excess, contingent or otherwise . . . .

. . . . .

17. WHEN LOSS IS PAYABLE.

If we are liable under this insurance, we will pay for "ultimate net loss" after:

a. (1) The insured's liability is established by court decision; or

(2) There is a written agreement between the claimant, the insured, any "underlying insurer" and us; and

b. The amount of the "applicable underlying limit" is paid by or on behalf of the insured . . . .

### C. *SIR Enforceability*

"AISLIC argues that the SIR must be satisfied by payment from Daley and only from Daley. Given Daley's bankruptcy, AISLIC's interpretation creates a legal impossibility." Travelers' Opp. 11:10–13. Travelers argues on that basis the SIR endorsement is unenforceable because at the time 4S tendered its defense to AISLIC, Daley was in bankruptcy and "obviously could not pay the SIR amount by operation of law," rendering "satisfaction of the express terms of the SIR . . . a condition subsequent which was impossible to perform." Travelers' Opp. 10:22–27. The court decides the motions on other grounds and finds it need not reach this issue.

Travelers also argues AISLIC interprets its SIR endorsement in a manner that violates CAL.CIV. CODE § 11580.[11] That statute imposes a "mandate *against a provision in a policy* that relieves an insurer of its obligation under the policy based upon the insured's insolvency or bankruptcy." Travelers' Mot. P & A 11:15–19 (emphasis added). Section 11580 requires that certain provisions must appear in policies insuring against certain kinds of losses, including among others: "A provision that the insolvency or bankruptcy of the insured will not release the insurer from the payment of damages for . . . loss occasioned during the life of such policy." CAL. INS. CODE § 11580(b)(1). That section permits an injured party, as a judgment creditor of the insured, to sue the insurer to enforce the judgment obtained against the insured after trial. *Rose v. Royal Ins. Co.*, 2 Cal.App.4th 709, 716, 3 Cal.Rptr.2d 483 (1991).

The court does not decide these motions based on any statutory ground and finds it need not reach the issue of an alleged Section 11580 violation. In any event, this is a dispute between insurance companies. Travelers is not an injured party judgment creditor pursuing an insurer. The AISLIC Coverages section contain the required statement that insolvency of the insured will not release the insurer from its obligation to pay damages for loss occasioned during the life of the policy. AISLIC paid damages for Daley in the Underlying Action while Daley was in bankruptcy proceedings. Deficiencies in

---

11. In particular, Travelers argues that AISLIC's defense of Daley in the Underlying Action belies the policy interpretation advanced to justify its denial of defense obligations to 4S. AISLIC "provided coverage to Daley by implementing an alternative route to satisfaction of the SIR," whereas "4S was not provided with equal consideration in direct contravention of Insurance Code § 11850." Travelers' Reply 7:25–8:1. "In this case, the SIR was satisfied when AISLIC took its 'credit.' If it was not satisfied by that credit, it violates section 11580 because the bankruptcy of Daley has essentially released AISLIC from its obligations to defend 4S. Therefore, pursuant to section 11580, AISLIC had an obligation to defend 4S despite the SIR." Travelers' Mot. P & A 12:22–27.

AISLIC's treatment of its additional insured are discussed in context below.

### D. *Satisfaction Of The Self Insured Retention*

The SIR endorsements expressly require Daley itself to carry the risk for the first $25,000 of "claim costs" per occurrence. *See* SIR Endorsement ¶¶ 5, 9.E. AISLIC argues Daley failed to satisfy the SIR, so that no defense or coverage obligation was triggered under its policies. Travelers argues the SIR of at least one of the AISLIC policies was satisfied through the "credit" AISLIC gave itself by deducting the $25,000 value of the SIR from the indemnity sum paid on Daley's behalf in the Underlying Action, triggering AISLIC's defense and indemnity obligations to 4S, its additional insured.

AISLIC argues it voluntarily undertook Daley's defense in the Underlying Action only to help limit Daley's ultimate liability,[12] inasmuch as Daley would not otherwise have been defended. AISLIC Opp. P & A 11:15–18. AISLIC admits it "agreed to contribute to settlement of the claims brought against Daley by 4S Partners in the [Underlying Action] after taking a 'credit' for the self-insured retention." Llaneta Decl. Ex. 9, Admission No. 2, 3:14–16. AISLIC admits the company construed that "credit" as "satisfaction" of the SIR. AISLIC contributed approximately $27,500 in indemnity payout, exclusive of defense costs, toward the $52,500 settlement on Daley's behalf (after deducting the $25,000 SIR equivalent). Second Llaneta Decl. Exh. 15, Johnson Decl. pp. 30–31. AISLIC argues "[w]hether or not AISLIC contributed to settlement of claims made against another insured under the policy is wholly irrelevant to the issue as to whether AISLIC was obligated to defend 4S Partners against the claims made in the [Underlying Action]." Llaneta Decl. Ex. 9, Admission No. 4, 3:23–25; Admission 2, 3:8–10. The court disagrees.

Peggy Johnson, a Claims Specialist assigned responsibility for claims handling for AISLIC's insureds in the Underlying Action (Johnson Decl. ¶ 1), testified at her deposition:

Q. Has the self-insured retention been paid?

A. Its been satisfied.

Q. And what do you meant that its been satisfied?

A. There was a credit taken at the settlement for the [$]25,000 SIR.

Q. And when you say "credit taken at the settlement," what do you mean by that?

A. The settlement was decreased by the $25,000 SIR.

. . . . .

Q. So whatever was paid as Daley's portion of the settlement of the Alva Road action was reduced by $25,000 to satisfy the SIR amount?

A. Correct.

Second Llaneta Decl. Exh. 15, Johnson Decl. pp 28–29 (emphasis added).

Ms. Johnson further testified she did not know how much AISLIC paid for Daley's defense in the Underlying Action, but she did not believe AISLIC sought reimbursement of those defense expenses: "A. If there is a recovery, it usually goes to the recovery department. But with an SIR being satisfied, I doubt that it would go to recovery." Second Llaneta Decl. Exh. 15, Johnson Decl. p. 30 (emphasis added). Johnson testified the claims service used the same claim number for the claim filed

---

12. However, the SIR endorsement cannot be read in isolation. The Coverages section of the policy expressly provides: "Bankruptcy or insolvency of the insured ... will not relieve us of our obligations **under this Coverages Part**." Section IV.1.

by Daily as for the claim 4S filed related to the Underlying Action because "4S came in first. It was denied prior to the cross-complaint, I believe. If the AI tender is accepted, then the file is split." [13] *Id.*, Johnson Decl. p. 32.

■■ The policy language links the $25,000 SIR to each "occurrence," not to each insured. "Occurrence" refers to the underlying cause of injury, rather than the injury or claim itself. *See Whittaker Corp.*, 11 Cal.App.4th at 1241–42, n. 2, 14 Cal.Rptr.2d 659. Once the SIR was satisfied as to Daley, the court finds as a matter of law the SIR was satisfied as to all the insureds with respect to that occurrence. The economic result AISLIC achieved is identical to the position it would have been in under its CGL policies Coverages obligations had Daley been able to pay the SIR portion of its liability in the Underlying Action from its own assets, triggering AISLIC's Coverages obligations. The court sees no principled difference between receiving a "credit" against a liability, reducing the amount the insurer would otherwise have been contractually obligated to pay but for the "credit" taken, and a direct payment of the SIR by the insured,[14] as the SIR was a "per occurrence" retention, not a "per occurrence per insured" retention.[15]

### E. AISLIC's Duty To Defend 4S In The Underlying Action

■■ Construction contracts usually require contractors and subcontractors to maintain CGL insurance naming the owner as an "additional insured." *See Rossmoor Sanitation, Inc. v. Pylon, Inc.*, 13 Cal.3d 622, 626, 119 Cal.Rptr. 449, 532 P.2d 97 (1975). An owner or developer named as an additional insured in such policies is entitled to a defense of the "entire action" as long as any claim "arises out of" that contractor's work. *Presley Homes, Inc. v. American States Ins. Co.*, 90 Cal.App.4th 571, 576, 108 Cal.Rptr.2d 686 (2001). Naming additional insureds obligates the insurer both to indemnify and to defend the additional insured for covered risks. *See Id.* at 577, 108 Cal.Rptr.2d 686; *Hartford Cas. Ins. Co.*, 123 Cal.App.4th at 303, 20 Cal.Rptr.3d 128. The covered party is entitled to rely "on the policies' language and the nature of the activity covered by

13. Johnson further testified she made the decisions to deny 4S's tender, to defend Daley, and to settle on behalf of Daley. She explains the decision to defend Daley but not 4S as: "There were no other carriers for Daley. Daley was in bankruptcy. We didn't want anything going sideways." Second Llaneta Decl. Ex. 15, Johnson Decl. pp. 32–33. She attributed the decision to deny 4S's tender of defense as "[b]ased on the exclusions" in the policy. *Id.*, Johnson Decl. p. 33.

14. The SIR endorsement actually suggests such a result: "We may assume control of the defense or settlement" of a claim or suit AISLIC believes "may result in payments . . . in an amount in excess of the retention amount [, but] [y]ou will continue to be responsible for the payment of the retention amount." SIR Endorsement ¶ 5.

15. Travelers also argues the SIR endorsements are not enforceable against "additional insureds" like 4S because the endorsement was an agreement between Daley and AISLIC only. 4S "was not a party to that agreement, and never agreed to pay an SIR." Travelers' Opp. P & A 12:5–7. "Thus, the plain language of the CGL policy imposes the burden of reimbursing the deductible on the party qualifying as 'named insured,' as defined, and not on those qualifying as 'persons insured,' 'insured,' or 'additional persons insured-required by contract' as defined elsewhere in the contract." Travelers' Opp. P & A 12:1–3. The court need not reach that argument. The SIR is unambiguously a "per occurrence" SIR. Nothing in the policies suggests AISLIC would be entitled to extract a "per insured" $25,000 out-of-pocket expenditure for the same "occurrence" arising out of Daley's work from each insured covered by the policy.

them" even though the additional insured does not participate in obtaining or paying for the coverage, which remains a matter of contract between the insurer and its named insured. *Presley Homes*, 90 Cal. App.4th at 577, 108 Cal.Rptr.2d 686.

 "Since a defense duty is broader than an indemnification obligation, the limitation on the scope of coverage does not eliminate the defense duty, but instead merely forms the parameters for that duty." *Maryland Cas. Co.*, 65 Cal.App.4th at 29–31, 76 Cal.Rptr.2d 113 (finding language in an endorsement to a CGL policy that "insurance applied only to the extent" the additional insured was "held liable" for the insured's acts or omissions did not limit the insurer's duty to defend an obligation to reimburse defense costs in the event the additional insured was ultimately found liable; the additional insured was entitled to reasonably expect that the endorsement included a promised defense obligation, absent language expressly excluding that duty), *citing Buss*, 16 Cal.4th at 46–47, fn. 10, 65 Cal.Rptr.2d 366, 939 P.2d 766; *see also Presley Homes*, 90 Cal. App.4th at 576, 108 Cal.Rptr.2d 686.

A primary CGL policy provision requiring that the insured cover the first portion of a loss has the effect of rendering the carrier an "excess" insurer with respect to the insured, to the extent of the SIR. Until the SIR is satisfied, the insured is its own "primary insurer" and the insurer has no duty to defend or to indemnify. *City of Oxnard v. Twin City Fire Ins. Co.*, 37 Cal.App.4th 1072, 1077–78, 44 Cal.Rptr.2d 177 (1995) ("As a self-insurer [Insured] was solely liable for its defense costs at-

tributable to the extent of the SIR, just as a primary insurer is responsible for defense expenses attributable to the extent of its coverage"); *see General Star Indem. Co. v. Sup.Ct. (Hard Rock Café America)*, 47 Cal.App.4th 1586, 1593, 55 Cal.Rptr.2d 322 (1996); *Vons Cos., Inc. v. U.S. Fire Ins. Co.*, 78 Cal.App.4th 52, 63–64, 92 Cal. Rptr.2d 597 (2000). Policies subject to self-insured retentions are treated like excess policies: "It is well recognized that self-insured retentions are the equivalent of primary insurance and that policies which are subject to self-insurance retentions are 'excess policies' which have no duty to indemnify until the self-insured retention is exhausted." *Pacific Employers Ins. Co. v. Domino's Pizza, Inc.*, 144 F.3d 1270, 1276–77 (9th Cir.1998) (citations omitted); *see also General Star Indem. Co.*, 47 Cal.App.4th at 1593, 55 Cal.Rptr.2d 322 (SIR endorsement effectively transforms policy into excess coverage).

An "umbrella" policy is on top of other coverage and is "excess" in the sense that it is usually over "any type of primary coverage, excess provisions arising in any manner, or escape clauses."[16] *Continental Ins. Co. v. Lexington Ins. Co.*, 55 Cal. App.4th 637, 647, 64 Cal.Rptr.2d 116 (1997) (treating umbrella policy as excess to primary auto policy which, as a result of a contingency clause, had itself been converted into an excess policy).

 The determination whether the insurer owes a defense turns on: the terms of the policy; the allegations of the third party's complaint against the insured (irrespective of their meritoriousness); and all

---

**16.** Umbrella policies may also provide broader coverage than the underlying insurance to fill gaps in coverage left open by the primary coverage, in addition to increasing the total possible recovery available to the insured, so as to provide "primary" coverage for claims not covered by the underlying policy. *Reserve Ins. Co. v. Pisciotta*, 30 Cal.3d 800, 812, 180

Cal.Rptr. 628, 640 P.2d 764 (1982); *see Wells Fargo Bank v. Calif. Ins. Guarantee Assoc.*, 38 Cal.App.4th 936, 940, 45 Cal.Rptr.2d 537 (1995) (third-level excess insurer not required to provide drop down coverage even in the event of second-level underlying insurer's insolvency, based on clear policy language).

facts known to the insurer from any source. *Montrose*, 6 Cal.4th at 295–96, 24 Cal.Rptr.2d 467, 861 P.2d 1153. Policies are "viewed in the light of [their] general objects and purposes." *Continental Ins. Co.*, 55 Cal.App.4th at 646, 64 Cal.Rptr.2d 116 (citation omitted). Policy language determines whether the umbrella policy actually provides additional coverage or coverage different than the primary insurance at issue. *Wells Fargo Bank v. Calif. Ins. Guarantee Assoc.*, 38 Cal.App.4th 936, 947–48, 45 Cal.Rptr.2d 537 (1995). Whether an excess insurer must "drop down" to assume the obligations of the primary insurer (for example, due to an exclusion applicable only to the primary insurance) also depends on policy language. *See Ticor Title Ins. Co. v. Employers Ins. of Wausau*, 40 Cal.App.4th 1699, 1707, 48 Cal.Rptr.2d 368 (1995) (addressing "drop down" issues due to primary insurer's insolvency or refusal to defend). If not, before coverage or a duty to defend attaches under an excess umbrella policy, the policy limits of all underlying primary insurers on the risk normally must be exhausted. *Community Redevelopment Agency of City of Los Angeles v. Aetna Cas. & Sur. Co.*, 50 Cal.App.4th 329, 339, 57 Cal.Rptr.2d 755 (1996). As expressly provided in the Travelers policy, primary coverage is "exhausted" when the primary insurers have paid their policy limits in settlement of claims or to satisfy a judgment against the insured. *See* Diemer Decl. Exh. 2, Section I.A.2.b.(2).

█ "In short, excess insurance is insurance that is expressly understood by both the insurer and the insured to be secondary to specific underlying coverage which will not begin until *after* that underlying coverage is exhausted and which does not broaden that underlying coverage." *American Cas. Co. of Reading, Pa. v. General Star Indem. Co.*, 125 Cal. App.4th 1510, 1521, 24 Cal.Rptr.3d 34 (2005) (citations omitted). The Travelers' policy prominently identifies itself as Commercial Excess Liability (Umbrella) Insurance, providing 4S only secondary coverage. *See* Diemer Decl. Ex. 11, TRV00274. The policy expressly excludes any duty to defend the insured in "any claim or 'suit' that any other insurer has a duty to defend," and recites it is "excess over any other insurance." *Id.,* Section I, Coverage A.2.a.

█ The duty of an excess insurer to drop down never arises when the defense of the insured and the discharge of a particular judgment are within the coverage of a primary insurer (or lower level excess carrier) whose policy limits are not exhausted. A true umbrella insurer has no obligation to contribute to the defense or indemnity expenses incurred by the primary insurer on behalf of their mutual insured.[17] A primary insurer owes the exclusive duty to defend, even when the third party claim against the insured exceeds the amount of primary coverage so that the claim might invade the overlying excess coverage. That eventuality does not shift the duty to defend to the excess carrier. *See Signal Cos., Inc. v. Harbor Ins. Co.*, 27 Cal.3d 359, 368, 165 Cal.Rptr.

---

17. "[W]here two or more **primary insurers' policies** contain excess 'other insurance' **clauses purporting to be excess to each other**, the conflicting clauses will be ignored and the loss prorated among the insurers on the ground the insured would otherwise be deprived of protection ... [while] **a true excess insurer**—one that is solely and explicitly an excess insurer providing only secondary coverage—has **no duty to defend or indemnify until all the underlying primary coverage is exhausted** or otherwise not on the risk ..." *Fireman's Fund Ins. Co. v. Maryland Cas. Co.*, 65 Cal.App.4th 1279, 1304–05, 77 Cal.Rptr.2d 296 (1998) (emphasis added), *citing, inter alia, Olympic Ins. Co. v. Employers Surplus Lines Ins. Co.*, 126 Cal.App.3d 593, 599, 178 Cal.Rptr. 908 (1981).

799, 612 P.2d 889 (1980) ("the primary insurer .... is solely liable for the costs of defense if the judgment does not exceed primary coverage"); *Truck Ins. Exch. v. Unigard Ins. Co.*, 79 Cal.App.4th 966, 978, 94 Cal.Rptr.2d 516 (2000).

AISLIC characterizes its policy provisions as reserving to its sole discretion the choice whether to defend, in reliance only on the SIR endorsement language. AISLIC Opp. 11:18–20. AISLIC argues cases Travelers relies on are distinguishable because they involve policies containing an express duty to defend, whereas its policies purportedly contain only an indemnity obligation, and only after the insured satisfies the SIR. "As such, AISLIC could not have had an obligation to defend 4S in the Underlying Action regardless as to whether the claims alleged in the Underlying Action were potentially covered under the AISLIC policies." AISLIC Opp. P & A 10:1–3. AISLIC repeatedly emphasizes its policy "provides that AISLIC has the right, *but not the obligation,* to defend insureds for claims covered under the policy," in reliance solely on language in the SIR endorsement, ignoring the Coverages section language. Llaneta Decl. Ex. 9, Admission No. 3, 4:3–4.

While it may be true, as AISLIC maintains, that if the SIR is not satisfied, "no defense obligation arises under the [AISLIC] policies," because their "policies apply in excess of *a $25,000 per occurrence Self Insured Retention,*" the circumstances of this case compel a finding the SIR was satisfied. *See, e.g.,* Llaneta Decl. Ex. 11, July 3, 2003 letter denying 4S's tender of defense. AISLIC takes the position that "the SIR may only be satisfied through

payments made by the named insured and cannot be satisfied through payments made by any other insurance," and until it is satisfied, no duties to 4S arose, despite acknowledging a deduction of the SIR through the indemnity. credit it took against its payment obligation, avoiding liability for any amount within the $25,000 SIR and liability in excess of the SIR. AISLIC Opp. 14:5–6.

> The named insured was bankrupt at the time that the Underlying Action was filed. As such, Daley did not satisfy the SIR. Thus, even if the AISLIC policies are found to contain a defense obligation, AISLIC still would not have been required to defend 4S Partners because the event triggering coverage under the policies, i.e., satisfaction of the SIR, did not occur.

AISLIC Opp. 14:10–13 (emphasis added).

AISLIC contends its policies purportedly never promised a defense, so the defense costs "rightfully fell on the other insured's excess carrier," because Travelers "agree[d] to provide a defense to its insured for covered claims when no other insurer had a duty to defend." [18] AISLIC Opp. P & A 13:8–10 (emphasis added); AISLIC Opp. P & A 12–17–13:9, 16:9–11. In fact, the SIR endorsement provides that AISLIC assumes no obligation to defend or indemnify *until* the SIR is satisfied. Thereafter, the contract obligations necessarily become those of the main policy. AISLIC admits the SIR was "satisfied." The AISLIC Coverages provisions not only do not "negate" a duty to defend, but expressly substantiate that duty. Satisfaction of Daley's SIR in relation to the same occurrence in the same lawsuit for

---

**18.** AISLIC misquotes the Travelers' policy in its Opp. P & A fn. 3. Subsection "a." quoted there does not read "We will have the duty to defend any claim or 'suit' that any other insurer has a duty to defend," but rather "We will have no duty to defend ....." AISLIC is

correct Subsection "b." does obligate Travelers "to defend any 'suit for damages payable under [the coverages provisions of the policy] ... which are not payable by a policy of' underlying insurance ..."

which 4S tendered its defense to AISLIC forecloses any colorable defense the policy Coverages were not triggered. *See* Johnson Decl. Exhs. C, D ("SECTION I— COVERAGES, 1. Insuring Agreement. a.... We will have the right and duty to defend any 'suit' seeking" damages "the insured becomes legally obligated to pay because of ... 'property damage' ") (emphasis added). The duty to defend the "insured" encompasses "additional insureds" added by endorsement. *Maryland Cas. Co.*, 65 Cal.App.4th at 29–30, 76 Cal. Rptr.2d 113. The only caveat in the AISLIC policy endorsement extending coverage to 4S as an "additional insured" was that coverage under Daley's policies extended to 4S "only with respect to liability arising out of 'your work' for that insured by or for you." Johnson Decl.. Exh. E. This language is the equivalent of the language in *Maryland Cas. Co.*, 65 Cal.App.4th at 30, 76 Cal.Rptr.2d 113, where an endorsement to a standard CGL policy extended coverage to additional insureds "only to the extent" they were "held liable" for the named insured's acts or omissions. The *Maryland Cas.* court found the language to be ambiguous, because it could be interpreted either as a condition precedent to *any* indemnity or defense obligation under the policy or merely as a limit on indemnification. That court adopted the latter interpretation because there, as here, it tracked the additional insured's "objectively reasonable expectations" in the context of the entire policy. *Id.*

AISLIC paid damages "in excess of the retention amount" on Daley's behalf, as the terms of the policies required it to do, without approaching policy limits. The Coverages declarations expressly impose a duty to defend, and such a duty would be implied by law in any event.[19] AISLIC owed the same defense and indemnity obligations to the additional insured as to the original named insured once the policy Coverages were triggered. The insurer must defend the entire action even when only one of several claims is potentially covered. *Horace Mann Ins. Co.*, 4 Cal.4th at 1081, 17 Cal.Rptr.2d 210, 846 P.2d 792; *Wausau Underwriters Ins. Co.*, 68 Cal. App.4th at 1047, 80 Cal.Rptr.2d 688.

Construing the Coverages provisions independently of the SIR provisions once the SIR was "satisfied" gives effect not only to AISLIC's express duty to defend but also to the provision reciting that the bankruptcy of the insured, a circumstance that prevented Daley from being able to pay the $25,000 SIR from its own assets, will not "relieve" AISLIC of its "obligations *under this Coverage Part.*" *See* Johnson Decl. Exh. C, p. 7 of 12, Exh. D p. 7 of 12 (emphasis added).

■ In further support of this construction, under the "reasonable expectations" doctrine, ambiguity in policy language is first addressed by attempting to determine whether coverage is consistent with the insured's objectively reasonable expectations, in consideration of the context of the language and its intended function in the policy. If that construction does not resolve the ambiguity, the term is construed against the insurer. *See Bank of the West v. Sup.Ct.*, 2 Cal.4th 1254, 1264–65, 10 Cal.Rptr.2d 538, 833 P.2d 545 (1992). In this case, the Additional Insured endorsement extended to 4S the defense and indemnity protections of AISL-

19. In addition: "California law imposes on insurers a duty to defend unless a contrary intention appears in the insurance contract. *See* CAL.CIV.CODE § 2778.... '[A]ny exception to the performance of the underlying obligation must be so stated as clearly to apprise the insured of its effect.' " *Mt. Hawley Ins. Co. v. FSLIC*, 695 F.Supp. 469, 474 (C.D.Cal.1987), *quoting Gray v. Zurich Ins. Co.*, 65 Cal.2d 263 (1966).

IC policy coverages for liability 4S might incur due to Daley's work, protections Daley but not 4S received.[20] The plain language of the Insuring Agreement commits AISLIC to "pay those sums that the insured becomes legally obligated to pay as damages because of ... 'property damage' to which this insurance applies," *and* AISLIC assumed "the right **and duty to defend** any 'suit' seeking those damages." Johnson Decl. Exhs. C, D, Section I, 1.a. The "right **and duty to defend**" expressly continues until "we have used up the applicable limit of insurance in the payment of judgments or settlements." *Id.* The AISLIC policies' Coverages commitments thus expressly include a duty to defend 4S in litigation involving whether Daley's work on the Project exposed either insured to third party damages liability.

The court accordingly finds, as a matter of law, AISLIC had a duty to defend 4S in the Underlying Action, unless such a duty was excused by other contract terms. Any other construction would read out of the policy Coverages section an express obligation assumed by the carrier.

### F. *The "J1" Exclusion Does Not Apply*

While the insured bears the burden to prove a claim is within the scope of the insuring agreement, the insurer bears the burden of proving the applicability of an exclusion. *Waller,* 11 Cal.4th at 16, 44 Cal.Rptr.2d 370, 900 P.2d 619. AISLIC relied on the Exclusion J(1) provision as one ground for denying 4S's tender of defense in July 2003 and continues to assert that defense. The J1 exclusion, as pertinent here, applies to " 'Property Damage' to: (1) Property [the insured] own[s]

..." Johnson Decl. Exhs. C, D. p. 3. While acknowledging 4S qualifies as an "additional insured," AISLIC maintains: *"During the 5/1/91 to 5/1/93 policy periods, 4S Ranch et al was the owner of the property and lots for the plaintiffs involved in the action, therefore Exclusion J(1) would apply."* Llaneta Decl. Ex. 11 (July 3, 2003 letter rejecting tender of defense).

"Endorsements are modifications to the basic insuring forms in the policy [and] may alter or vary any term or condition of the policy" *Adams v. Explorer Ins. Co.,* 107 Cal.App.4th 438, 450, 132 Cal.Rptr.2d 24 (2003) (citation omitted); *see Continental Cas. Co. v. Phoenix Constr. Co.* 46 Cal.2d 423, 431, 296 P.2d 801 (1956) ("if there is a conflict in meaning between an endorsement and the body of the policy, the endorsement controls"). The ISO standard endorsement naming 4S an "Additional Insured" expressly applies to "Owners." *See* Johnson Decl. Ex. E. Insuring 4S against liability arising out of Daley's work on the Project was the sole object and purpose for naming 4S as an additional insured. AISLIC's invocation of the J1 exclusion to excuse its rejection of 4S's tender of defense would render the "Additional Insured" endorsement an illusory nullity, a construction the court rejects.

### G. *Equitable Contribution*

"An insurer that has paid defense and settlement expenses may pursue reimbursement from other insurers on various equitable grounds, including subrogation and contribution." *Hartford Cas. Ins. Co.,* 123 Cal.App.4th at 286–87, 20 Cal.Rptr.3d 128. "[W]here two or more

---

**20.** Moreover, 4S's expectations in obtaining coverage for such liability cannot reasonably be construed as acceptance of an obligation to itself pay Daley's separate endorsement obligation of a $25,000 SIR before AISLIC would indemnify 4S. Nevertheless, the insurer's determination the SIR was "satisfied" must be construed as activating the Coverages provisions for all the insureds to avoid an absurd result.

insurers provide *primary* insurance on the same risk for which they are *both liable for any loss* to the same insured, the insurance carrier who pays the loss or defends a lawsuit against the insured is entitled to equitable contribution from the other insurer or insurers, without regard to principles of equitable subrogation." *Fireman's Fund,* 65 Cal.App.4th at 1289, 77 Cal. Rptr.2d 296 (emphasis added). Equitable contribution "is the right to recover, not from the party *primarily* liable for the loss, but from a *co-obligor* who *shares* such liability with the party seeking contribution." *Id.* at 1293, 77 Cal.Rptr.2d 296. "Unlike subrogation, the right to equitable contribution exists *independently* of the rights of the insured" and does not arise out of contract. *Id.* at 1293–94, 77 Cal. Rptr.2d 296 ("Equitable contribution permits reimbursement to the insurer that paid on the loss for the excess it paid over its proportionate share of the obligation, on the theory that the debt it paid was *equally* and *concurrently* owed by the other insurers and should be shared by them pro rata in proportion to their respective coverage of the risk").

Equitable contribution issues tend to arise in situations where two CGL policies contain conflicting "other insurance" clauses. *Carmel Dev. Co. v. RLI Ins. Co.,* 126 Cal.App.4th 502, 509–10, 24 Cal.Rptr.3d 588 (2005) ("Only if the two policies were insuring the same risk at **the same level of coverage** will we proceed to determine whether the 'other insurance' clauses conflicted and thus required equitable proration" of defense or indemnity costs) (emphasis added); *see Fireman's Fund,* 65 Cal.App.4th at 1293, 1298, 77 Cal.Rptr.2d

296. "The purpose of this rule of equity is to accomplish substantial justice by equalizing the common burden shared by coinsureds, and to prevent one insurer from profiting at the expense of others." *Id.,* at 1293–94, 77 Cal.Rptr.2d 296. Therefore, there is generally no right to equitable contribution between a primary and an excess carrier, absent a specific agreement to the contrary. *See American Cas. Co.,* 125 Cal.App.4th at 1520–21, 24 Cal.Rptr.3d 34 ("there is no obligation of contribution between primary and excess insurers ... because they are not on the same level of liability, absent a specific agreement to the contrary"). An "other insurance" dispute accordingly can only arise between carriers on the same level; **it cannot arise between excess and primary insurers.**[21] *Olympic Ins. Co.,* 126 Cal.App.3d at 598, 178 Cal.Rptr. 908 (prorating between two "primary" carriers whose policies contained competing "other insurance" provisions but denying a claim for proration against the secondary carrier involved whose policy also contained an "other insurance" provision).

 "[U]umbrella coverage is generally regarded 'as true excess over and above any type of primary coverage, excess provisions arising in any manner, or escape clauses.'" *Carmel Dev.,* 126 Cal.App.4th at 513–14, 24 Cal.Rptr.3d 588 (citations omitted). Travelers is a true excess insurer under a policy expressly identified as "umbrella," whereas AISLIC's CGL policy Coverages obligations to 4S are primary, indisputably so following satisfaction of the SIR. The Travelers policy period began in November 1995, years after AISLIC policy

---

21. The "original historical purpose of such 'other insurance' clauses ... was to prevent multiple recoveries by *insureds* in cases of overlapping insurance policies providing coverage for the same loss..." *Fireman's Fund,* 65 Cal.App.4th at 1306, 77 Cal.Rptr.2d 296. The "general rule, when multiple policies share the *same risk* but have inconsistent 'other insurance' clauses, is to prorate according to the policy limits." *Carmel Dev. Co.,* 126 Cal.App.4th at 509, 24 Cal.Rptr.3d 588 (emphasis added), *quoting Fireman's Fund,* 65 Cal.App.4th at 1306, 77 Cal.Rptr.2d 296.

periods of 1991–91 and 1992–93 insuring Daley and 4S for liability arising out of Daley's work on the Project during that time. Diemer Decl. Ex. 2. Travelers thus did not insure 4S for the "same risk" at the same level as did AISLIC. For the foregoing reasons, Traveler's motion on a theory of equitable contribution is ***DENIED***.

## H. Equitable Subrogation

 Principles of equitable subrogation rather than equitable contribution apply to disputes between insurers when the insurers do not share the same level of risk. In contrast to equitable contribution, the aim of equitable subrogation is to place the burden for a loss on the party ultimately responsible for it and by whom it should have been discharged, and to relieve entirely the insurer or surety who indemnified the loss and who in equity was not primarily liable for it.[22] *St. Paul Mercury Ins. Co. v. Frontier Pacific ins. Co.,* 111 Cal.App.4th 1234, 1253, 4 Cal.Rptr.3d 416 (2003); *see Fireman's Fund,* 65 Cal. App.4th at 1299, 77 Cal.Rptr.2d 296 (equitable subrogation applies in the situation where "the claimed loss was one for which the [insurer who paid] was *not* primarily liable, and justice requires that loss be shifted to the [insurer] whose equitable position was inferior to the paying insurer's").[23]

 An insurer's right of subrogation is purely derivative of the rights of the insured. An insurer seeking subrogation against another insurer "stand[s] in the shoes of the insured" and is therefore subject to defenses that the other insurer could have asserted if the insured had sued it directly. "Thus, an insurer cannot acquire by subrogation anything to which the insured has no rights, and may claim no rights which the insured does not." *Fireman's Fund,* 65 Cal.App.4th at 1292, 77 Cal.Rptr.2d 296; *see American Cas. Co.,* 125 Cal.App.4th at 1522, 24 Cal.Rptr.3d 34.

22. "The essential elements of an insurer's cause of action for equitable subrogation are as follows: (a) the insured suffered a loss for which the defendant is liable, either as the wrongdoer whose act or omission caused the loss or because the defendant is legally responsible to the insured for the loss caused by the wrongdoer; (b) the claimed loss was one for which the insurer was *not* primarily liable; (c) the insurer has compensated the insured in whole or in part for the same loss for which the defendant is primarily liable; (d) the insurer has paid the claim of its insured to protect its own interest and not as a volunteer; (e) the insured has an existing, assignable cause of action against the defendant which the insured could have asserted for its own benefit and it not been compensated for its loss by the insurer; (f) the insurer has suffered damages caused by the act or omission upon which the liability of the defendant depends; (g) justice requires that the loss be entirely shifted from the insurer to the defendant, whose equitable position is inferior to that of the insurer; and (h) the insurer's damages are in a liquidated sum, generally the amount paid to the insured." *Fireman's Fund Ins. Co.,* 65 Cal.App.4th at 1292, 77 Cal.Rptr.2d 296 (citations omitted).

23. "Whereas subrogation requires that the party to be charged be in an 'equitable position ... inferior to that of the insurer,' such that justice requires the entire loss be shifted from the insurer to the party to be charged ..., contribution permits liability for the loss to be allocated among the various insurers without regard to questions of comparative fault or the relative equities between the insurers." *Fireman's Fund,* 65 Cal.App.4th at 1296, 77 Cal.Rptr.2d 296 (citations omitted). The public policy underlying subrogation is "to place the burden for a loss on the party ultimately liable or responsible for it and by whom it should have been discharged, and to relieve the insurer or surety who indemnified the loss and who in equity was *not* primarily liable therefore," whereas the "aim of equitable contribution is to apportion a loss between two or more insurers who cover the same risk, so that each pays its fair share and one does not profit at the expense of the others." *Id.* (citations omitted).

The court has found 4S had, at a minimum, the right to benefit from the per-occurrence $25,000 SIR satisfaction, as an "additional insured," rendering AISLIC the next primary insurer (and first insurance company) in line. AISLIC thus owed 4S a defense in the Underlying Action under the express terms of the policies' Coverages provisions. Travelers' obligations, by the express terms of its policy, are triggered only in the event all primary coverage is first exhausted. *See American Continental Ins. Co. v. American Cas. Co. of Reading, Pa.*, 73 Cal.App.4th 508, 514, 86 Cal.Rptr.2d 560 (1999); *Fireman's Fund*, 65 Cal.App.4th at 1305, 77 Cal. Rptr.2d 296. The AISLIC policy limits have not been exhausted.

■ The AISLIC policies contain an "other insurance" section with an "excess insurance" clause. "Other insurance" clauses become relevant only when several insurers insure the same risk at the same level of coverage. *Reliance Nat'l Indem. Co. v. General Star Indem. Co.*, 72 Cal. App.4th 1063, 1077–78, 85 Cal.Rptr.2d 627 (1999). " 'Excess-only' provisions in otherwise primary liability insurance policies have been analogized to so-called 'escape' clauses whereby coverage purports to disappear in the presence of other insurance. Such 'escape' clauses are generally disfavored as a matter of public policy." *Fireman's Fund*, 65 Cal.App.4th at 1305–06, 77 Cal.Rptr.2d 296; *see Commerce & Industry Ins. Co. v. Chubb Custom Ins. Co.*, 75 Cal.App.4th 739, 744, 89 Cal.Rptr.2d 415 (1999) (if an "excess" clause is part of a primary liability policy, rather than in a policy expressly identified as "excess" or "umbrella," it is treated the same way as an "escape" clause). In contrast, an excess liability *policy* creates an express agreement between an insurer and its insured that the coverage provided will not become effective until specific underlying coverage is exhausted. *See Century Surety Co. v. United Pac. Ins. Co.*, 109 Cal.

App.4th 1246, 1255, 135 Cal.Rptr.2d 879 (2003); *North River Ins. Co. v. American Home Assurance Co.*, 210 Cal.App.3d 108, 114, 257 Cal.Rptr. 129 (1989) ("A secondary policy, by its own terms, does not apply to cover a loss until the underlying primary insurance has been exhausted"). A secondary insurer has no duty to defend or to indemnify "until *all* of the primary insurance has been exhausted." *Community Redevelopment Agency*, 50 Cal. App.4th at 339–41, 57 Cal.Rptr.2d 755; *Continental Ins. Co.*, 55 Cal.App.4th at 645, 64 Cal.Rptr.2d 116; *Signal Cos., Inc.*, 27 Cal.3d at 368–69, 165 Cal.Rptr. 799, 612 P.2d 889; *Fireman's Fund*, 65 Cal.App.4th at 1304–05, 77 Cal.Rptr.2d 296.

■ Travelers provided 4S a defense in the Underlying Action under a reservation of rights. Unless the excess policy provides otherwise (and Travelers' does not), the primary insurer owes the *exclusive* duty to defend the insured against third party claims until the primary coverage is exhausted or otherwise not on the risk. *Signal Cos. Inc.*, 27 Cal.3d at 380, 165 Cal.Rptr. 799, 612 P.2d 889. If the lawsuit is concluded without exhausting "the applicable limits of any other underlying insurance," the excess insurer never has any duty to "drop down" and pay for defense expenditures. *Community Redevelopment Agency*, 50 Cal.App.4th at 341–42, 57 Cal.Rptr.2d 755. The primary insurer's refusal, while still on the risk, to defend a third party claim against the insured *does not* trigger the excess insurer's duty to defend (*i.e.* no "drop down"), even where the amount of the claim approaches or exceeds the primary's policy limits. *Ticor Title*, 40 Cal.App.4th at 1708–09, 48 Cal.Rptr.2d 368 (where policy required excess insurer to defend if "no defense *coverage* provided by underlying insurance," it did not apply to a primary's refusal to defend); *see also Republic West-*

*ern Ins. Co. v. Fireman's Fund Ins. Co.,* 241 F.Supp.2d 1090, 1096 (N.D.Cal.2003) (no defense owed under excess policy, "[s]o long as defense obligations were payable, regardless of whether they were actually paid by the primary carrier").

 A hierarchy of coverage emerges from the policies at issue here. The SIR provision in the AISLIC policies obligated Daley to cover the first $25,000 per occurrence, followed by AISLIC's express duty thereafter to defend and to cover liability up to the recited policy limit, followed by the "umbrella" coverage provided by Travelers' policy, the latter triggered only when all underlying primary coverage is exhausted. In cases where the insurers' coverage "is in the nature of layers, the excess carriers should recover under subrogation before the primary insurers can be reimbursed" when reimbursement circumstances arise. *See Century Indem. Co.,* 12 Cal.App.4th at 1710, 16 Cal.Rptr.2d 393. "[A]n excess insurer has no duty to defend where the primary insurer refused the tender of defense." *Republic Western Ins. Co.,* 241 F.Supp.2d at 1096, *citing Ticor Title,* 40 Cal.App.4th 1699, 48 Cal. Rptr.2d 368. The excess insurer may decide as a practical matter to step in and provide a defense in order to limit the insured's liability, and then sue the primary insurer for indemnity. That appears to be what happened in this case.

 The court finds as a matter of law AISLIC's duty to defend 4S in the Underlying Action was primary to Travelers' duty, and Travelers' duty was never triggered. Accordingly, Travelers is entitled to shift to AISLIC the costs it incurred to defend 4S in the Underlying Action. Traveler's motion for summary adjudica-

tion of its subrogation claim in its favor is *GRANTED*.

## I. *Subrogated Defense Expenses*

Travelers seeks all its defense expenses on 4S's behalf in the Underlying Action. Travelers' P & A 11:10. "Travelers paid $890,064.88 in defense expenses on behalf of 4S." *Id.* 15:23–24. The Diemer Declaration represents "[d]efense costs incurred after January 29, 2003 were $547,884.97." Diemer Decl. Exh. 12;[24] Travelers' P & A 1524–161.

 The duty of any particular insurer to undertake or contribute to the defense of its insured is triggered by the insured's tender of the defense. *See Truck Ins. Exch.,* 79 Cal.App.4th at 979, 94 Cal.Rptr.2d 516; *Foster–Gardner Inc.,* 18 Cal.4th at 869, 886, 77 Cal.Rptr.2d 107, 959 P.2d 265; *Time Oil Co.,* 743 F.Supp. at 1420 ("Courts and commentators agree that the duty to defend only arises after the insured tenders the defense"). The AISLIC policies oblige the insured. "to see to it that *we* receive written notice of the claim or 'suit'...." Johnson Decl. Exhs C, D p. 7 of 12 (emphasis added). "We" is defined in the policies as: "**the company providing this insurance.**" *Id.* p. 1 of 12 (emphasis added). A "tender of defense" adequate to trigger an insurer's obligation must accordingly be made to "the company" or its agent. *See* CAL. CIV. CODE § 2332 (notice to agent is equivalent to notice to the principal). The insured must tender a third-party "suit" (*see* AISLIC policies Section I, Coverages, "Insuring Agreement," subsection (a)).[25] The insurer's duty to indemnify [the insured does] not somehow trigger a pre-tender duty to

---

24. Exhibit 12 is a summary multi-page "payment register related to the payment of defense expenses." Diemer Decl. ¶ 4.

25. "We will have the right and duty to defend any 'suit' seeking ... damages" because of " 'property damage' to which this insurance applies...." Johnson Decl. Exhs. C, D, p. 3 of 12.

defend .... *Icasiano v. Allstate Ins. Co.*, 103 F.Supp.2d 1187, 1191; *see Zurich Ins. Co. v. Killer Music*, 998 F.2d 674, 679 (9th Cir.1993). Once triggered, the duty to defend is "a continuing one, arising on tender of defense and lasting until the underlying lawsuit is concluded, or until it has been shown that there is no potential for coverage...." *Montrose*, 6 Cal.4th at 295, 24 Cal.Rptr.2d 467, 861 P.2d 1153 (citation omitted) (original italics); *Buss*, 16 Cal.4th at 46, 65 Cal.Rptr.2d 366, 939 P.2d 766 (defense duty "arises as soon as tender is made" and extends to allegations that are actually or potentially covered).

The parties' Undisputed Fact No. 3 acknowledges that on June 22, 2001, defense counsel for 4S sent to Daley Corporation a document prominently headed entitled "TENDER OF CLAIM AND DEMAND FOR DEFENSE," with ·a notation at the end: "cc: John Burn[ ]ham & Company." Travelers' P & A 16:2–6; *see* Rafner Decl. Exh. 9. Although the letter's authenticity is not challenged, the parties dispute its legal significance. Travelers argues "counsel for 4S originally requested a defense from AISLIC by carbon copy of its tender letter to AISLIC's [purported] agent John Burnham & Company" on "June 22, 2001, at the inception of the underlying litigation." AISLIC denies John Burnam was its agent. AISLIC's Opp. 16:22–26. The June 2001 letter is not addressed to AISLIC or its authorized handling agent, AIG Claims Services, Inc., nor is there any evidence AISLIC received that correspondence. *Id.* 16:25–17:2. Travelers produces no evidence to support an allegation John Burnam was an AISLIC agent adequate to perfect a tender of defense, or at all. In addition, the Complaint alleges 4S tendered its defense to AISLIC "on January 29, 2003," without mentioning the earlier correspondence in connection with any tender to AISLIC. Compl. ¶ 11; *cf.* Travelers' Mot. P & A 5:11–12 (characterizing the January 29,

2003 as a "second tender, addressed directly to Ms. Trish McFarland of AIG Insurance Company"), *citing* Exh. 10. Despite AISLIC's actual notice of the claims through its participation on Daley's behalf in the Underlying Action, based on the Complaint allegations and Traveler's failure to counter AISLIC's Opposition with respect to the June 22, 2001 letter being construed as a binding tender of defense, Travelers has not carried its summary judgment burden to advance the timing of 4S's tender of defense. The January 29, 2003 letter is addressed to "AIG Insurance Company." It bears the heading: "TENDER OF DEFENSE AND DEMAND FOR INDEMNITY AND INSURANCE." Johnson Decl. Exh. A. The court finds as a matter of law, on this record, 4S's first viable tender of defense to AISLIC occurred with the January 29, 2003 letter.

Travelers contends coinsurers who refuse to join in the defense of a covered claim "waive" the right to challenge the reasonableness of defense costs incurred. *See American Star Ins. Co. v. Insurance Co. of the West*, 232 Cal.App.3d 1320, 1332–33, 284 Cal.Rptr. 45 (1991); *see Phoenix Ins. Co. v. United States Fire Ins. Co.*, 189 Cal.App.3d 1511, 1526–27, 235 Cal. Rptr. 185 (1987). Nevertheless, the claimed sum is supported by only the barest summary evidence. *See* Diemer Decl. Ex. 12. The court will awarded Travelers its eligible defense expenses in the Underlying Action on behalf of 4S when these are either stipulated by the parties or determined in a separate ruling after supplemental briefing.

## III. CONCLUSION AND ORDER

For the foregoing reasons, **IT IS HEREBY ORDERED**:

1. Defendant AISLIC's Motion For Summary Judgment is **DENIED**.

2. Plaintiff Traveler's Motion For Summary Judgment is **GRANTED**.

3. Travelers, as excess carrier, is entitled to subrogated reimbursement from AISLIC for expenses Travelers incurred to defend 4S in the Underlying Action.

4. The timing of AISLIC's defense obligation to 4S was triggered by 4S's January 29, 2003 tender of its defense.

5. On or before April 14, 2006, the parties shall meet, confer, jointly prepare, and lodge in the chambers of the undersigned District Judge a [Proposed] Judgment disposing of this case in conformity with this Order, including the amount of the subrogated defenses expenses.

6. Alternatively, if the parties are unable to agree on the amount of the monetary award, on or before April 14, 2006, they shall file concurrent briefing addressing the issue of the amount of the subrogated defense expenses, in the form of points and authorities and declarations identifying their areas of disagreement, not to exceed ten pages per side, plus any necessary exhibits, then await further order of the court.

IT IS SO ORDERED.